The State, Respondent, v. Lamb, Appellant.

1. To render a voluntary confession, made by an accused person before a committing magistrate and reduced to writing by the latter, admissible in evidence on the trial, it is not necessary that the record of the proceedings of the magistrate should show specifically that the prisoner was distinctly informed of the charge made against him and that he was at liberty to refuse to answer any question put to him, and that a reasonable time was allowed the prisoner to advise with his counsel and for that purpose to send for counsel; it is sufficient if it be shown upon the trial, by the testimony of the committing magistrate, that the requirements of the statute in this regard had been complied with.

2. A judicial confession is sufficient to found a capital conviction upon, although uncorroborated by any independent proof of the *corpus delicti*.

3. An extra-judicial confession, with extrinsic circumstantial evidence satisfying the minds of a jury beyond a reasonable doubt that the crime charged has been committed, will warrant a conviction, although the dead body may not have been discovered and seen so that its existence and identity can be testified to by an eye-witness.

*Appeal from St. Louis Criminal Court.*

George H. Lamb was indicted for the murder of his wife Sarah S. Lamb by drowning her in the Mississippi river, in

December, 1857. The evidence chiefly relied upon on the part of the State was the confession of Lamb voluntarily made by him before Rudolph Herkenrath, a justice of the peace, in the city of St. Louis, before whom he was taken for examination. The transcript of the docket of the justice, which, together with the confession of Lamb reduced to writing by the justice and signed by Lamb, and other papers, were delivered to the clerk of the criminal court, contained the following statement: "Defendant, with consent of the attorney for the State, waives an examination, and having been advised by the justice of his rights under the statute, makes a voluntary confession, filed herewith." The confession was as follows: "I was married to Sarah S. Stafford in the court-house at Quincy, Illinois, in November, 1856, by a justice of the peace. I was then a resident of Mendota, La Salle county, state of Illinois. I did not take my wife to Mendota with me. I left her with her father at Hamilton. I returned to Mendota. Last November, (1857,) I went to Hamilton to remove her from her father, to go to Memphis or some place south to spend the winter. My wife and I came to St. Louis, I think about the 28th of November, 1857. We got here about daylight in the morning, and took breakfast and dinner at King's Hotel. From there we went up to the Astor House on Franklin avenue, kept by Hermann Norp. My wife was unwell during the time we were at the Astor House. I had two physicians attending on her — Dr. Christopher and Dr. Washington. Her sickness was caused by my giving her poison, strychnine. I bought it on Broadway, in a drug store in this city. I bought it for the purpose of giving it to her. I think I gave the strychnine to her twice. My intention was to dispose of her in some way. I had in my mind to destroy her. Norp and his lady came in and showed a good deal of distress about it, and I sent then for a physician for fear they might suspect something. The physicians prescribed for her. I gave to her what the physicians prescribed for her. I think I did exactly. I may not have given it to her. She recovered from the effects of

the poison administered to her. She threw it up before I had given her the prescription of the physician. I think she did because she vomited. I think I gave her the poison about the 2d or 3d of December. She was confined to her bed some days. She set up only a little while at a time for about two weeks after. About the 17th of December, we left the Astor House; the sun might have been about two or three hours high yet. I told her I was going down the river to Carondelet. We left there in a baggage wagon. No body went in the wagon with us but the driver. We took a band-box with a bonnet in it with us. She was apparently perfectly willing to go with me. We went down to the lower ferry landing. I did not know the driver of the baggage wagon. I think he was a colored man. We got out at the ferry landing. She sat in a room there. There was a young man there. I asked him whether she might sit there. He said she might. I had told some boys to bring a skiff there for me. I paid them at that time six or seven dollars for the skiff. We remained there about a full hour before the boys brought the skiff. My wife left in the skiff about two minutes after the boys had come. We started on down the river. We stopped about fifty rods below the steamboats, near where the streets are built out in the river, to get a stone or weight. I told her I wanted the stone to put in the bottom of the boat to keep it more even. One of the boys brought me two stones. There were two boys; each one brought one. I did not go out of the skiff at all. My design was to use these stones to sink the body. I noticed an island or sand bar. I saw an island without trees on it on the Missouri side. The island must be above Carondelet. I noticed but one island. We proceeded about half way down the island, on the east side of the island, near the channel, where the steamboats run. It was getting considerably dark. It may have been from twenty to fifty rods. * * * It is rather on the Missouri side of the channel. The steamboats ran between us and the Illinois shore. I then put my hand right back of her neck and pushed her head under the water. I held her

State v. Lamb.

head about two minutes under the water. I then raised her head partly out. She was dead. Her death was caused by my holding her head under the water. * I then took the two shawls off and took the bonnet off, and took a string of twine and wrapped it around one of the stones and tied it, and then tied the twine around her neck. The string between her head and the stone was about four to six feet long. I then lifted the stone over the skiff and then let down the stone and the stone thus drew her right down. The stone may have weighed about ten or twelve pounds; was about eight inches long and four inches thick. I got the twine for the purpose of using it as I did. I got the stones to sink the body. After sinking the body I went right ashore. I got ashore on the sand-bar on the Missouri shore. I then shoved the skiff right out in the stream. It was a medium sized skiff, from thirteen to fourteen feet long. I can't tell whether the skiff was painted. I left the oars; there were three or four—two short ones and two of pretty good length. I left no stones in the skiff. There was a rope or a chain in the skiff. I halloed from the sand-bar about an hour until an old countryman, I think a Dutchman, came and crossed me over. It was getting dark when I threw her overboard. I designed drowning my wife when I left the Astor House with her. I felt dissatisfied and felt as if I could not live happily with her. That was my motive for drowning her. She had never said or done any thing to cause me to feel that way that I can think of. I could not say that I had any ill-

---

* On the morning preceding his execution, Mr. Lamb gave to the clergy-man in attendance upon him the following account of the killing of his wife. He stated that when he left the Astor House he told his wife he was going to Carondelet, and that in order to reach that place it would be necessary to take a skiff and sail down the river; that he proceeded with her to the foot of Carr street, in the city of St. Louis, where, upon reaching the edge of the water, and in close proximity to the skiff, he threw her down and held her head under the water until she was dead; that it was day-light, about four and a half or five o'clock, P. M.; that he then placed her body in the skiff and rowed down the river; that at a point in the river just below Caronde-let, he threw the body overboard, having first attached to it a cord with a stone attached.—[REP.

feelings toward her or any of her relatives. I felt as if I could not go back with her as my wife amongst my relations and acquaintances, as I had married one who was not my equal. I came up to the city about nine o'clock that night. I lodged in a house on the east side of Broadway, between Cherry and Wash streets. There was a hat store a little above that got on fire before that time. I don't know the name of the house nor of the man who kept it. I left the city, I think, the next day after. I went then right to her parents. I took her baggage to them. I told them I had buried her in Memphis. I gave them the names of the physicians who attended on her. I don't recollect the names now. I told them this to cover it up in some way. I married again on the 30th of December, 1857, a girl by the name of Louisa Shortliff. She did not know that I had been previously married to Sarah Stafford. I married so soon after the death of my wife because she said she would not wait any longer. She did not know any thing of this. She was perfectly innocent. I had been keeping company with her along through the fall months. I can not bring in any other excuse for murdering my wife than for the purpose of marrying that other woman. My present wife was not in the family way before I married her. I had not had any intercourse with her before our marriage. My opinion is that the piece of French merino now produced is of the dress my wife had on when I drowned her. I have made a confession to Mr. Stafford that two men were in the skiff with me. I am sorry that I have said it. That was a false statement. This statement is a true one as near as I can tell it. I don't know why I told Mr. Stafford that two men were with me, unless it must have been the evil spirit in me that made me tell it. Two men knew of my design to murder my wife. I think they only knew it a few days before I did it. I told them all they knew. I asked one of them to assist me in the matter. He expressed his willingness to assist me out of friendship. He went down to the river alone on foot, not in a wagon. His name is Josiah Moyer. At that time he was boarding at the

house where I lodged the night I came back. I paid him five dollars for assisting me. He knew my intention when I went to the river. He carried nothing to the river for me. We talked about his going down with me a little before we started. He went down because I wished him to. The other man's name, whom I had informed, was Joseph Sawyer. He was in Mendota when I left. I don't know where he is now. I told Mr. Moyer this; I think I said in these words that "every thing had gone under." Moyer was a small sized man, of about one hundred and thirty pounds, of a dark complexion, spare-faced man; I think black hair. He is a painter by trade. I don't know where he resides. He may be from twenty-five to thirty years old. They are the only two persons who knew of my design. I had said something about it to a man by the name of Thomas S. Beal. He left the city before it transpired. Sawyer is about five feet ten inches high. I may have told him things that I don't think of. Norp and family did not know any thing of it at all. My intention when I came here was and is to tell the plain truth. It will relieve my mind some at any rate. I have no hard feelings against the two men. As soon as I had sunk the body I left right away. I did not stay to notice if the body rose again. I let the stone down the length of the twine, and the stone drew it right down. There were two men in the skiff that took me from the bar on shore. They made their skiff fast there to something and then we went together towards town. I then stopped at a public house and took the omnibus. I saw Moyer standing on some boat when I left the ferry landing. I next saw him after that on Franklin avenue. I told him that every thing had gone under. I have not seen Moyer since I left this place. I paid Moyer the five dollars for assisting me in carrying the baggage from the Astor House to his lodging room. Moyer had no money to pay his board. His intention was then to give it back to me. He did not take it with the understanding to assist me for the five dollars. If there is any thing in this statement contradictory to any former statement, it is

not from any intention on my part to say what was not true. From the condition of my mind at this time it might not be a wonder that it would not agree with what I have stated before. I have endeavored to make a frank confession. I have once left the church. It is the transgression of my duties toward my God that has brought me here and brought this on me."

The circuit attorney; previous to offering the above confession in evidence, introduced Herkenrath, the justice before whom Lamb was taken for examination and before whom the confession was made, as a witness. He stated, in substance, that Lamb was duly informed of his rights; that the affidavit of Mr. Stafford, upon which he was arrested, was read to him; that he was distinctly informed of the charge made against him, and that he was at liberty to refuse to answer any question put to him; that he informed Lamb that he might send for and advise with counsel; that he declined doing so and stated that he wished to make a confession. The defendant, by his counsel, objected to the introduction of the confession and accompanying paper " on the ground that it could not be read as a judicial confession because not taken in due course of law, as the transcript shows on its face; nor as extra-judicial, because it purported to be an examination of the prisoner, had before a judicial tribunal, in which the defendant was a prisoner, by legal process, on a legal accusation." The court overruled the objection and admitted the confession in evidence.

Other testimony was introduced corroborating the truth of the statements made by Lamb in his confession. The date of his marriage to Miss Stafford, the circumstances under which that marriage took place, his mode of life previous to his starting professedly for Memphis with his wife; the fact that he came to St. Louis and went with his wife to Norp or Noble's to board; that while there he did send for beer for his wife; that on two several occasions his wife became very sick at Norp's or Noble's — being afflicted with convulsions in some form; that Drs. Christopher and Washington were

State v. Lamb.

successively called in to prescribe for Mrs. Lamb; that though they did not suspect the administering of poison to her, yet some of her symptoms were such as might possibly have resulted from strychnine; the fact that he came to Noble's on the 28th of November and left, professedly on his way to Memphis, on the 17th of December, 1857, in a baggage wagon, as stated in the confession, about three o'clock in the afternoon; that he came back and at about nine o'clock in the evening engaged lodgings at the place on Broadway mentioned in the confession; that the next day he left the city and went to Mr. Stafford's and stated that his wife had died at Memphis; that he married Miss Shortliff immediately; all these facts were proven by evidence outside the confession.

The court, of its own motion, charged the jury as follows: " 1. If the jury believe from the evidence that the defendant, at St. Louis county and previous to the finding of the indictment, did wilfully, deliberately, premeditatedly, and of his malice aforethought, kill and murder Sarah S. Lamb in manner and form as charged in the indictment, they will find him guilty of the offence of murder in the first degree. 2. If the jury have reasonable doubt of the guilt of the defendant, they ought to give him the benefit of the doubt and acquit for that reason. 3. To warrant a conviction of the defendant, the jury must be satisfied by the proofs that Sarah S. Lamb is dead; that she met her death at the hands of the defendant as charged in the indictment, and in the county of St. Louis, as also charged."

The defendant was found guilty of murder in the first degree.

*U. & J. T. Wright*, for appellant.

I. The verdict and judgment are void for want of jurisdiction in the court. All the evidence is preserved and it fails to show that the alleged crime was committed in St. Louis county. This is fatal. (23 Mo. 509; 3 S. & M. 533.)

II. The paper purporting to be the statement of defendant on his examination before the justice was improperly received

in evidence. The transcript of the justice does not show a compliance with the precedent conditions essential to its admissibility as legal evidence. The justice could no more judicially certify that he construed correctly and enforced aright the provisions of the statute than a sheriff can return that he served a writ according to the provisions of law. The justice acts ministerially; the transcript must record what he did. (R. C. 1855, p. 1162, § 15, 16, 17.) It was error to let the justice supply by parol evidence the defects of the transcript. (1 Greenl. Ev. § 224, 227; 8 C. & P. 375, 547, 551; 2 Stark. Ev. 571.) The paper could not be read as a judicial confession because not taken in " due course of law," nor as extra-judicial because it purports to have been taken in his examination before a judicial tribunal in which the defendant was a prisoner by legal process on a legal execution. The court erred in permitting the justice to answer the question, " what took place or what was said and done between you and the prisoner at the time you took down the confession ?" The evidence thus allowed to go to the jury embraced words of the justice and words of the defendant made during his examination, not contained in the written evidence of his statement.

III. The evidence was legally insufficient for conviction. The body of the offence was not proved *aliunde* the confession, and that is essential. (1 Hayw. 524; 15 Wend. 153; 2 Hale P. C. 290; Burrill on Circum. Ev. 678; Best on Presumptions, § 202; Hindmarsh's case, 2 Leach, 649; 26 Miss. 157; 12 Mo. 592; 4 Black. 357; 1 South. 239; Whart. C. L. 313; Wills on Cir. Ev. 61; 1 Wend. 53; Peck, 140; 1 Greenl. § 247; 17 Ill. 426; Rogers, N. Y., 150; Bible, Joshua, ch. 7, v. 22; 2 Sam. ch. 1, v. 16.) The confession in this case was falsified by the evidence as to the poisoning at Noble's. It is manifest from the confession itself that there were witnesses not in court who could have proved facts of the utmost importance bearing upon the *corpus delicti* so as to bring this case within the operation of the principle of Hennessy's case, 15 Wend. 153.

IV. The instructions were improper, and inadequate —
improper, because they left the jury to the conclusion that
the confession was competent to establish of itself, 1st, the
fact of the death of Sarah Lamb; 2d, that she was killed
by defendant; and 3d, that she was killed in the manner
set out in the indictment, and that no independent proof
need be shown to authorize a conviction; — inadequate, be-
cause there was no word of caution or light given to the
jury as to how they should deal with confessions.

*Mauro,* (circuit attorney,) for the State.

I. The production of the dead body is not always indis-
pensable in cases of capital homicide. The death may be
inferred from circumstances. (See 3 Greenl. Ev. § 30;
Commonwealth v. Webster, 5 Cush. 296; United States v.
Gilbert, 2 Sumn. 27; U. S. v. Johns, 1 Wash. C. C. 372;
Burrill on Cir. Ev. 679; People v. Ruloff, 3 Parker, 401.)
The *corpus delicti* as well as the guilt of the defendant may
be established by judicial confession made either in open
court or on examination before a committing magistrate,
though there be no corroborating circumstances proven in
evidence. The same is true of extra-judicial confessions.
Unquestionably so when the truth of such confession is made
apparent by the proof of the truth, by evidence outside and
independent of the confession, of facts and circumstances
stated therein. (Joy on Conf. 64; 2 Russ. on Crimes, 824;
1 Phill. Ev. 111; 2 Stark. 39; MacNally on Ev. 51; 1
Hayw. 524; 7 Ired. 239; 11 Georg. 237; 15 Wend. 152;
16 Wend. 53; 12 Mo. 593; 17 Ill. 426.) The material inqui-
ry is not, has the *corpus delicti* been otherwise established?
but, are there corroborating facts and circumstance proven
outside the confession establishing its truth? The confession
in this case is a judicial confession. Besides, it is corrobora-
ted in so striking a manner by the proof of the matters sta-
ted in it as to produce the fullest assurance of its truth.
Even if it be but an extra-judicial confession, it may be safely
relied on for all purposes. The venue was proved. So the
jury determined.

SCOTT, Judge, delivered the opinion of the court.

We will notice in their order the several points on which the prisoner seeks a reversal of the judgment against him.

A ground of complaint against the judgment of the court below is, that there was no evidence, or at least an insufficiency of evidence, to warrant the jury in finding that the murder was committed within St. Louis county, the county in which the indictment charges the crime to have been committed. It is maintained that the want of this evidence renders the verdict and judgment void, as showing that there was no jurisdiction in the court. The fact of the venue is like any other material fact in a criminal case; it must be satisfactorily proved; otherwise the prosecution must fail. There is no more importance attached to this fact than to any other material one, and an omission or failure to prove it is attended with no more serious consequences than an omission or failure to prove any other essential element in the crime. It is submitted to the jury like all other facts to be proved, nor is any other or a greater weight of evidence necessary to establish it than any other fact. The jury are the judges of the weight of the evidence, and if it causes conviction in their minds it is not the province of an appellate court to interfere, after the court before which the cause was tried has expressed its approbation of the verdict by refusing to grant a new trial. In our opinion, the evidence in the cause on this point was amply sufficient to warrant the verdict of the jury.

Complaint is also made that the court erred in permitting the confession of the prisoner taken before the committing magistrate to be read in evidence, inasmuch as it did not appear from the justice's transcript that he was distinctly informed of the charge made against him, and that he was at liberty to refuse to answer any question put to him; that the transcript merely stated that the prisoner, having been advised of his rights under the statute, made a voluntary confession. And it is maintained that it should have appeared

from the justice's examination that the accused was advised specifically of his rights under the statute, stating what they were ; that it was not for the justice to determine the rights to which he was entitled, but they should have been spe cifically mentioned, in order that the courts might ascertain whether the statute was complied with or not.    It seems that the English statute on. this subject did not require that the prisoner should be informed as to his rights.  McNally says, it does not appear necessary that the magistrate, acting judi cially under the direction of the statute of Phil. & Mary, should, in order to make the written confession evidence, warn the prisoner of its effects against him on the trial. (McNally Ev. 26 ; 2 Stark. Ev. 29.)   Our statute only re quires the examination to be taken in writing.  Nothing else is required to be put down.    As the examination of the prisoner might be read against him as a confession, there was a propriety in requiring it to be committed to writing that is not so obvious as to the facts preceding and accompanying it.    That which was to affect the prisoner and which might be forgotten or perverted, the statute required to be written down, for plain reasons not applicable to other acts and form- ing no part of the confession.    Without determining whether the examination might not have been read on the presump- tion that the officer had performed his duty ; inasmuch as the magistrate was sworn on the trial and proved that the spe- cific information required by the statute was communicated to the prisoner, that the affidavit on which the warrant issued was read to him, and` he informed that he was at liberty to refuse to answer any question put to him, we are of the opin- ion that the law was complied with and the prisoner deprived of no right to which he was entitled.

It was further objected to the validity of the judgment that the evidence was legally insufficient for conviction ; that, independent of the confession of the prisoner, there was no proof that Sarah Lamb was dead ; that she came to her death by any crime, or that she was killed in the manner charged

in the indictment; that the body of the offence is not proved *aliunde* the confession, which is essential.

Confessions are either judicial or extra-judicial. Judicial confessions are those made in conformity to law before the committing magistrate, or in court in the due course of legal proceedings. It seems that these confessions, uncorroborated by any other proof of the *corpus delicti*, are sufficient to found a conviction, even if it be followed by a sentence of death, they being deliberately made, under the deepest solemnities, with the advice of counsel and the protecting caution and oversight of the judge. (1 Greenl. Ev. § 216.)

Extra-judicial confessions are those which are made by a party elsewhere than before a magistrate or in court. It is of these confessions, when uncorroborated by any other proof of the *corpus delicti*, that the question is made, whether they are sufficient to found a conviction. Whatever difference of opinion exists in respect to the weight which ought to be attached to evidence derived from these confessions, yet, where they are admissible and satisfactorily proved, they are deemed sufficient by the common law to convict a prisoner, even capitally, without the aid of any corroborative testimony of his having committed the offence. The principle thus stated does not exclude the idea that there may be evidence *aliunde* the confession of the *corpus delicti* and thus restricted it, is undoubtedly correct. (MacNally, 35; Joy on Conf. 64.) Instances may have occurred in which innocent persons have been convicted on false confessions; and so, too, innocent persons have been convicted by the testimony of perjured witnesses; but we are not therefore to reject all human testimony. No definite rules can be prescribed for ascertaining the credit to be given to confessions any more than to the evidence of witnesses. The weight to be attached to a confession, like the weight to be given to the testimony of a witness, must depend on the circumstances. The credit due it is a matter to be confided to the court and jury, and more justice will be done in the end by leaving each case to be

determined by its circumstances, than by attempting to impose arbitrary rules, which must result in many instances either in oppression to the accused or in impunity to the guilty. A modern author, speaking of the instances in which innocent persons have been convicted on confessions unfounded in truth, remarks that, whilst such anomalous cases ought to render courts and juries at all times extremely watchful of every fact attendant on confessions of guilt, these cases should never be invoked or so urged as to invalidate indiscriminately all confessions put to the jury, thus repudiating those salutary distinctions which the court, in the judicious exercise of its duty, shall be enabled to make. Such an use of these anomalies, which should be regarded as mere exceptions, and which should speak only in the voice of warning, is unprofessional and impolitic, and should be regarded as offensive both to the court and the jury. So it has been said that it appears inaccurate to give all kinds of confessions the same confidence, or to treat them alike with distrust. Like all other kinds of admissions, they admit of all shades of certainty and probability, from a solemn estoppel by matter of record to the slightest presumption arising from the most casual, suspicious or doubtful expressions. The jury are not only entitled, but bound to take into account all the circumstances under which a confession is made, and to give little weight to it, or throw it out of view altogether, according as these circumstances appear to incline less or more against the admission.

These observations apply unquestionably to confessions in cases in which it sufficiently appears from evidence outside the confession that the offence has been committed. But it is maintained that where the evidence of the *corpus delicti* is to be found only in the confession, and there is no positive testimony besides the confession that the crime has been committed, that a prisoner can not be convicted on his uncorroborated confession alone. We do not deem it necessary to enter into an examination of the abstract question whether, when the only evidence of the fact that a crime has been

committed is contained in the confession of the party charged with having committed the crime, he can be convicted on such a confession alone without any extrinsic corroborative circumstances. We term the question abstract, because such a case will rarely happen. The case of the prisoner is not of this class. Although the dead body has not been found, and although no witness swore that he saw the perpetration of the murder, yet the circumstances extrinsic to the confession, and established by other evidence, are so strong that they can not fail to satisfy any unbiased mind that the accused is guilty of the crime of which he has been convicted. We consider the true rule, as deduced from the current of authorities, to be, that an extra-judicial confession, with extrinsic circumstantial evidence satisfying the minds of a jury beyond a reasonable doubt that the crime has been committed, will warrant a conviction, although the dead body has not been discovered and seen, so that its existence and identity can be testified to by an eye-witness.

We do not deem it necessary to enter into an examination of all the authorities on this point. The rule as stated commends itself for its suitableness to the exigencies of all cases, and is in strict harmony with the principles on which all jury trials proceed. When the guilt or innocence of a prisoner is the subject of determination for a jury, they are the only competent judges of the sufficiency of the evidence to produce a conviction on their minds. When the evidence is legal and they are satisfied with its sufficiency, it is not for courts on fancied possibilities to disturb their verdicts. Our system of jurisprudence contemplates that jurors are as much superior to the courts in determining matters of fact as the courts are superior to them in deciding questions of law. The power of the courts to grant new trials finds no support in the mistrust of this principle, but is founded on the nature of the jury system, the liability of jurors to be misled, their being subject to err from undue influences to which they are exposed, and from the mode of their selection and the nature of their pursuits. (3 Greenl. Ev. § 30;

United States v. Gilbert et al., 2 Sum. 19; Burrill on Cir. Ev. 679; Whart. Cr. Law, 348-9.)

We are not of the opinion that the case made by the State was impaired or weakened by the failure to examine witnesses, who might have testified in relation to facts stated in the confession. It does not appear that any of the absent witnesses could have proved positively that the murder was committed; nor does it appear that the witnesses were within the power of the prosecution, or that any contrivance whatever was employed to keep them out of the way.

The prisoner asked no instructions, and we see no error in those given by the court. According to the law as has been stated, the confession, taken in connection with the extrinsic evidence, was amply sufficient to establish the fact of the murder of Sarah S. Lamb by the prisoner, in the manner charged in the indictment. The other judges concurring, the judgment will be affirmed.