# THE STATE v. PHIL LEWIS BOWMAN, JR., Appellant.

Division Two, June 8, 1922.

1. **MURDER:** Corpus Delicti: Elements. The law is well settled in this State, that the *corpus delicti* in murder consists of two elements, to-wit: (a) the death of the person alleged to have been murdered, and (b) the criminal agency of the person causing such death. Both of these must be established in a prosecution for murder, or the conviction cannot stand.

2. ——: ——: Proof Required: Uncorroborated Extra-Judicial Confession. In murder trials, the fact of death should be shown,

either by witnesses who were present, when the murderous act was done, or by proof of the body having been seen dead, or, if found in a state of decomposition or reduced to a skeleton, that it be identified by tests of the most clear and cogent character. And the confession of the defendant, not made in open court or on an examination before a committing court, but to an individual, uncorroborated by circumstances and without proof *aliunde* that a crime has been committed, will not justify a conviction.

3. ——: ——: ——: **Circumstantial Evidence: Presumption of Innocence.** In construing circumstantial or presumptive evidence in respect to the *corpus delicti* the court should proceed upon the theory that defendant is presumed to be innocent and that this presumption follows him until the case is finally disposed of in court; and where there has been a conviction of homicide, the court should ascertain and determine from the record whether such conviction is sustained by substantial evidence. If it rests altogether upon circumstantial evidence, the circumstances proved must be consistent with each other, consistent with the hypothesis that the accused is guilty, and at the same time inconsistent with the hypothesis that he is innocent and with every other rational hypothesis except that of guilt. If such conviction is based upon suspicion or conjecture, it should not be permitted to stand.

4. ——: ——: **Not Proven.** In this case, it is held that the *corpus delicti* was not sufficiently proven, there being no substantial evidence, in addition to evidence of extra-judicial confessions of defendant, that the person, charged to have been murdered by him, was dead at the time of the trial, and, therefore, defendant's demurrer to the evidence should have been sustained.

Appeal from Jackson Criminal Court.—*Hon. Ralph S. Latshaw,* Judge.

REVERSED AND REMANDED.

*Alpha N. Brown* and *John L. Gaylord* for appellant.

(1) The court erred in refusing to give the peremptory instruction requested by the defendant at the close of the State's evidence and at the close of all the evidence. (a) Evidence of an extra-judicial confession unsupported by independent proof of *corpus delicti* is not sufficient to base a conviction thereon. (b) There is no

direct proof of the fact of death and the fact of death cannot be shown by circumstantial evidence. 16 C. J. 735, 772; State v. Cox, 264 Mo. 408; State v. Young, 237 Mo. 170; State v. Walker, 98 Mo. 95; People v. Ranney, 153 Mich. 293; State v. Henderson, 186 Mo. 473; State v. Bowden, 153 S. W. 1033; 2 Hale P. C. 290; State v. Cox, 175 S. W. 50; State v. David, 131 Mo. 380; State v. Moxley, 102 Mo. 374; State v. Woolard, 111 Mo. 248; 4 Blackstone, 358; Rutloff v. People, 18 N. Y. 179; State v. Miller, 32 Atl. (Del.) 137. (2) The court erred in refusing to instruct the jury to find defendant not guilty as requested by the defendant for: (a) Even if *corpus delicti* can be shown by circumstantial evidence there is no substantial evidence in this case upon which to base a conviction. (b) Mere suspicion is not sufficient ground for a conviction. State v. Gordon, 199 Mo. 563; State v. Goldstein, 225 S. W. 913; State v. Wheaton, 221 S. W. 26; State v. German, 54 Mo. 526; State v. Young, 237 Mo. 177; State v. Clein, 154 Mo. App. 686; State v. Crabtree, 170 Mo. 657.

*Jesse W. Barrett,* Attorney-General, and *Albert Miller,* Assistant Attorney-General, for respondent.

(1) All of the elements of *corpus delicti,* including the fact of the death of the person alleged to have been murdered, as well as the criminal agency of the accused and the identity of the deceased, may be proved by circumstantial or presumptive evidence, when direct proof is not obtainable. State v. Poor, 228 S. W. 815; State v. Concelia, 250 Mo. 421; State v. Vinton, 220 Mo. 100; State v. Barrington, 198 Mo. 113; State v. Henderson, 186 Mo. 483. (2) The court did not commit error in overruling appellant's demurrer to the evidence, and, in submitting the case to the jury. The record discloses that there is substantial evidence upon which to submit the case to the jury. State v. Poor, 228 S. W. 810; State v. Henderson, 186 Mo. 473.

RAILEY, C.—On June 4, 1921, the Prosecuting At-
torney of Jackson County, Missouri, filed, in the criminal
court of said county, an information, charging therein
that said defendant, in the county aforesaid, on February
14, 1921, was guilty of first degree murder, in killing
one Estella Bowen with a knife and by burning the body.
The case was tried before a jury and, on November 10,
1921, the following verdict was returned:

"We, the jury, find the defendant guilty of murder
in the second degree as charged in the information and
assess his punishment at 25 years in the State Peniten-
tiary.

"HAROLD W. TURNER, Foreman."

Anna Bowen, on behalf of the State, testified in sub-
stance, that she was a single woman, forty years of age,
and lived at 530 Highland; that Estella Bowen was her
sister, and she last saw her at about 7:30 a. m. on Feb-
ruary 14, 1921; that Estella Bowen had been at the home
of witness, about one week prior to above date, and had
no other place to stay; that defendant and Estella had
two rented rooms adjoining the home of witness; that
they lived together there about one month; that on
February 14th, Estella told witness she was going to look
for a job; that she wore a black beaver hat, a wine-colored
coat with a fur collar on it; that she had on a white
middy, a blue serge skirt, and tan shoes; that the but-
tons on said coat were large, black, and with a wine-
colored eye in them; that she never saw any of those
buttons after February 14th, until she saw one in Chief
Walston's office, after defendant was arrested; that
Estella had a pair of black silk gloves, and they could
not be found around the house after she disappeared;
that her sister owned a homemade black-velvet handbag,
gathered by a string; that she saw this bag at the same
time she saw the button; that the above pocketbook or
bag looked like the one her sister owned; that defendant
was at her house the night before February 14th; that
he came to her door and asked for Estella, and the lat-

ter told him to wait until witness put a light out there, and she would come and see what he wanted; that defendant told Estella to come out there, as he wanted to talk to her; that he pulled her with his left hand, had his right hand in his coat pocket, and kept telling her to come out, as he wanted to talk to her; that she resisted him and told him to leave her alone; that he was there about five minutes and left, without saying a word; that he never took his right hand out of his coat pocket while there; that on Friday night before February 14th defendant was out in the street, and whistled for Estella, the second time before she heard him; that she then went to the hall, and they went into their room; that they remained in the room about one hour talking, defendant left, and Estella came to the room of witness; that she (Estella) was not defendant's wife; that on Tuesday morning, preceding the above Friday, she heard defendant say to Estella, "I don't want you;" that up to this time, they had lived together about one month.  Over the objection of defendant, witness was permitted to testify that defendant and Estella were fighting, came to her house and continued the fight, against the protest of witness; that defendant hurt her sister, left a big scar on her arm, hurt her foot, and said to her, "I am going to kill you yet;" that her sister said "he is talking about my dead mother;" that defendant somehow always accused Estella of keeping company with other people; that her sister Estella was twenty-five years old on February 14th, 1921; that defendant came to the house of witness about ten days before he was arrested; that he then asked her if Estella was there; this was between ten and eleven o'clock at night.

On cross-examination, witness testified that Estella had on tan stockings and tan shoes on February 14, 1921; that her sister fastened some of the buttons on her coat the night before she left; that the button she (witness) saw at the police office was off of Estella's coat. Witness denied testifying that defendant remained with

Estella about five minutes as heretofore stated. She testified that defendant did not hit Estella on Sunday night, but just pulled at her; that on Tuesday night defendant and her·sister were quarreling and he said he was going to kill her; that defendant slept there every night and made that his home; that about ten days after Estella disappeared, defendant asked witness if she was at her home.

On re-examination, witness said defendant was arrested on May 4th. She identified a pair of black silk gloves, as the property of her sister, and also identified said button, and the velvet bag. She also identified a purple silk shirt, as the property of defendant. She said Estella was at home at 6:30 p. m. the day before she disappeared.

Hilda Bowen lived at 412 Campbell on February 14, 1921. She testified, in substance, that she knew Estella Bowen and defendant; that in January defendant had a pistol at her house in his trousers; that he then told Estella to wait, that he had pulled off jobs and could bump her off the same way; that defendant had a knife in his hand in 1920, while in Kansas, and threatened her; that in the fall of 1920 defendant told Estella he was going away and that he did not want her. Witness identified the gloves, button, bag, etc., heretofore described as the property of Estella. She also identified the purple silk shirt as the property of defendant.

On cross-examination, witness said Estella was sitting on defendant's lap when he had the pistol and said he could bump her off.

Delcenia Brown, a witness for respondent, testified in substance, that in the summer of 1920 she saw defendant and Estella at the home of Mrs. Austin; that Estella hid behind the dining room door when informed that defendant was coming; that defendant asked if she was there, and was informed that she was; that appellant had a gun in his hand, and Estella ran through the house, screamed and put witness in front of her; that

appellant told her to come on and go home with him, and
she refused to do so; that Clara Butler threatened to
call the officers, but appellant told her to come back, that
he expected to find Estella in bed with another man and
he was going to kill them both.

Maynard Edwards, a witness for the State, lived in
Kansas City, Kansas. He testified, in substance, that
he had known defendant about three years; that defend-
ant stayed at his house about two years before the trial;
that he talked with defendant at the dance hall. Over
the objection of defendant, witness testified as follows:

"A.   At that time me and my wife was having
trouble and Phil told me I ought to do mine like he did
his.   Then he told me that Stella called him one day,
and he just played like he was friendly with her, and
she come out.   He was upstairs in the dance hall and he
played like he had to fire the furnace, and she went down-
stairs with him and when he got her down in the base-
ment—there are three basements there—and he took her
over in the third one and grabbed her and choked her
until she was pretty near unconscious and then took his
knife and cut her throat.

"Q.   Then what?   A.   Then he buried her body in
the coal pile until that night he come back and cut her
body up and put it in the furnace.

"Q.   Did he tell you anything further in regard to
putting her in under the coal?   A.   He said he buried
her in the coal pile, then went back and cut her body up
and burned it.

"Q.   Did he describe in detail how he put the coal
on her?   A.   Yes; when he was putting the coal on, she
kicked the coal off pretty near as fast as he put it on,
but finally she died and he covered her up.

"Q.   Then what?   A.   He come on away, then he
went back that night and cut her body up and burned it."

Witness further testified that defendant said Ken-
nedy told him he was going down town; that if Kennedy
had seen him he would have killed Kennedy also; that

defendant told witness he would kill witness's wife for him, if he did not have nerve enough to do so; that the above occurred about the last of March.

On cross-examination, witness said the above talk was upstairs; that he (witness) had been in jail for larceny, and was then a trusty; that he served thirteen months in the Reform School, for grand larceny; that defendant told him he burned Estella's body about two o'clock at night; that he cut her legs and arms off; that he never asked Kennedy for a job; that defendant told him he choked his wife, and cut her throat with a knife; that he killed her before he put her in the coal pile; that he (witness) was twenty-three years of age at the time of trial.

Ethel Walters testified in behalf of the State, substantially as follows: That she knew defendant and Estella Bowen; that defendant came to see her in April, 1921, and while there, wrote on a paper sack, "Stella is dead;" that he then tore up the sack; that after the other parties left, she asked defendant if he killed her or did Estella kill herself; that defendant said he did not do it; that he then dropped his head and said, "Yes, I did it." That he then told her in substance, he did so, because he could not get rid of her any other way; that defendant told her that Estella died about February 14, 1921.

On cross-examination witness said that when she first got acquainted with defendant, she went down to his room once or twice; that defendant did not tell her where he had killed Estella.

C. T. Everhart, in behalf of the State, testified, in substance, that he was connected with the detective department of the Metropolitan Police Force; that he was twenty-eight years old; that he knew Maynard Edwards. Witness described the buildings where defendant worked substantially as follows: That the basement is in three sections; that next to 22nd Street was a drug store; that the grocery store is over the second basement, and the picture show was over the third basement:

that it is a two-story business block; that there is a large dance hall on the second floor, and also a reception room and a cloak room. Witness described the furnace, coal pile, etc., under the dance hall. He testified that the basement under the second room was used for slaughtering chickens, etc.; that he was out at the dance hall on the afternoon of May 4, 1921, with Officer Schellerup, and investigated the premises; that they found defendant on the second floor, shaving ice; that they took him to headquarters, and he said he did not know what had become of Estella. He testified that defendant said she came to the dance hall on February 14, 1921; that he gave her some money, and that was the last time he had seen her; that defendant refused to give a statement, and said he did not know anything about the girl; that witness examined the box used by defendant in cutting the ice, which he found on a cinder pile outside; that several blood spots were on the box, one large one and several smaller ones; that they then went to the dance hall and found a number of personal articles; that among said articles was a silk shirt, which had spots on the front of it, and which defendant said belonged to him; that the right cuff was soaked with blood; that he found a hand-bag with some blood on it, and also found a pair of lady's gloves and a button; that said articles were taken to the police station; that defendant said the hand-bag, gloves, etc., were lost by dancers in the hall; that he picked them up and threw them back on the shelf; that this shelf was rigged up with stuff, and defendant told witness he had been sleeping on it. The above described place was the check room of the dance hall, and was not in the basement. This witness further testified as follows:

"Q. What further investigation or inspection did you make? A. Well, we searched the furnace to see what we could find in the furnace and down through the ash pile and in the furnace right in the fine ashes down in the grate we found a few small bones which we later

asked Bowman about, how those bones got there and he said that was an old cat they threw in the furnace and burned the cat up. We found a number of hair pins. and found a steel piece out of a corset in the furnace, and the miscellaneous things we found he claimed he swept up on the dance floor and threw them in the furnace. We asked him how the blood got on the front of his shirt, and he told us that he was trimming a corn and cut his corn and the blood squirted out on his shirt. Then we showed him his cuff, the blood soaked in the right cuff of his shirt, and asked him how the blood got on his right cuff, and he said he was knocking the head out of a barrel in which the grocery-store man had been killing chickens, he wanted the barrel to make kindling and the blood where they were killing the chickens run out and soaked his right cuff. The left cuff had no blood on it at all.''

He further testified, that all the coal was out of the basement; that it was a concrete floor and covered with dust; that inside the door near the furnace he found some splotches on the floor, and also leading back where the coal was originally; that Officer Schellerup took a clean handkerchief, rubbed it on the splotches and it appeared red; that there was a lot of blood in the middle basement room where they killed chickens; that these splotches were from the size of a dime to a quarter, and scattered out; that defendant told witness the coal was carried to the furnace in a wheel barrow; that the furnace door was large enough for an ordinary-size man to crawl through. The above articles and defendant's silk shirt were identified by witness. He also identified a few safety pins, hair pins, part of the steel out of a corset and a small black button, which defendant told him were dropped on the floor of the dance hall, and by him swept up and put in the furnace. Witness said he found in the furnace a bone about two inches long, tapered to a quarter of an inch wide and was about one-eighth of an inch thick, and was a stout bone. He said

the bone had been sent to be analyzed, and was lost; that the second bone found in the furnace was real small, was about one inch long and one-eighth of an inch thick; that it was burned and he couldn't tell much about it.

On cross-examination, witness could not account for the above bones, and could not tell where they were sent. He testified that he took some of the ashes which came out of the furnace to an undertaker, to see if they contained any bones, and was informed by the undertaker that they contained no bones; that he was told the middle room of the basement was used for slaughtering chickens; that there were barrels in said basement with blood spots on them. Witness admitted that he and another officer took defendant to the above basement about ten o'clock at night, and there asked him what he killed this girl for, and related to defendant the information which witness possessed in regard to the matter; that defendant told witness he did not do it.

Carrie Alston testified in substance for the State, that she last saw Estella about 1:30 p. m. on February 14, 1921; that Estella said she was going to call up defendant, but would not be gone long; that she was dressed in a blue serge skirt, a white middy, tan shoes, a red coat, and carried a hand-bag. Witness identified the black silk gloves, the shoes and the button as the property of Estella. She also identified the silk shirt belonging to defendant.

Anna Bowen was recalled by respondent and testified that Estella left her trunk and clothes at the home of witness and no one ever called for them.

The State here closed its case.

The defendant's evidence is substantially as follows:

Forney Kennedy testified for the defendant that he owned the building involved herein, and that he employed defendant as janitor until his arrest; that he knew Estella Bowen, and that she had been to the building four or five times within the two weeks prior to her disap-

pearance; that he had talked to her on the second floor several times, and that she and defendant acted affectionately when he saw them together; that he never heard defendant threaten her. He testified further that the sweepings from the dance floor were thrown into the furnace under his instructions, and that hair pins, buttons and corset stays were often found in the dance hall; that the pocket book and button exhibited had been in the check room for a long while, and that they often found pocket books and other articles in the dance hall, and it was customary to throw them back in the check room. He stated that defendant's duties carried him into the butchering room in the basement, and required him to work around the bloody boxes and barrels therein. The defense offered to prove by this witness that the alleged deceased, between the first and the fourteenth day of February, told the defendant and the witness that if the defendant would not come back to her he would never see her again. Upon objection the offer was denied. Kennedy further testified that at the time of the alleged homicide he was trying to sell the building, and that daily he was taking prospective buyers through the building, and the rooms in the basement; that he had never noticed any odor of burning flesh. The witness stated, in contradiction to the detective, that there were no blood stains on the coal room floor; that he had examined it with a flash light and that the discoloration described had been there four or five years. He further testified in impeachment of Maynard Edwards, that Edwards had phoned him the day of defendant's arrest, and asked for defendant's job, and came out there the day following to try and get the job.

Wesley Treweath, butcher for the grocery store, testified that a few weeks prior to defendant's arrest, he had thrown a dead cat into the furnace, and that bones and refuse from the butcher shop were constantly thrown into the furnace. He further stated that a large part

of the grocery stock was kept in the basement and this required some one going down practically every hour or so, and he identified a button found in the furnace ashes as a button from a butcher's coat. He described the bloody condition of the barrels, etc., and stated that he had never noticed any odor of burning flesh in the building.

J. S. Watkins, owner of the drug store, testified that part of his stock of goods was kept in the basement, and that he or one of his three employees went into the basement several times a day; that he never noticed any odor in the basement or drug store, which is directly over the furnace room.

Warner Howlett, the drug store porter, gave similar testimony.

Frank Newcomer, undertaker, testified that he had operated a crematory for a number of years; that to burn a human body in the ordinary furnace "would require ten or twelve hours" continuous firing, "some one putting in coal all the time," and that he doubted if it could be done even then; that a human body gives off a very violent odor, and that it would be impossible to burn a human body in a furnace without the odor permeating the entire building, and that in a slow process the odor would be more noticeable than in a fast cremating process. He further testified that to maintain the heat required to consume the body in ten or twelve hours would be disasterous to the hot-water boiler.

Defendant testified in his own behalf that Estella Bowen had visited the building at 22nd and Prospect on the fourteenth day of February; that she left there about two o'clock in the afternoon; that he walked toward the street car with her, and left her at the corner, he going into the drug store to buy a package of cigarettes, and she catching the street car and waving at him from the rear vestibule; that he had never seen alleged deceased since that time. He denied confessing to anyone. He stated that Estella Bowen's relatives had never

liked him; that they did not get along together.   He further stated that he had gotten the blood on his shirt while engaged in his duties as janitor in the basement room, and that he had found the hand-bag, gloves and buttons exhibited to the jury, in the dance hall.

The instructions given and refused, as well as the . rulings of the court during the progress of the trial, will be considered, as far as necessary, in the opinion.

Defendant, in due time, filed motions for a new trial and in arrest of judgment. Both motions were overruled and exceptions saved. On November 19, 1921, the court rendered judgment against defendant, and sentenced him for a period of ten years. From the judgment and sentence aforesaid, appellant duly appealed to this court.

I. Counsel for the respective parties to this action, in their oral arguments and briefs, have presented the law and facts with much force and clearness. It is earnestly contended by counsel for appellant that the State failed to establish, by competent, substantial testimony, the *corpus delicti,* and that by reason thereof their demurrer to the evidence should have been sustained at the

Corpus Delicti: Proof.

conclusion of the case.   On the other hand, it is claimed by counsel for the State that the death of Estella Bowen, and the criminal agency of defendant in producing same, have been shown by circumstantial or presumptive evidence.   In order to pass upon the conflicting views of counsel intelligently, we have made from the transcript a full and complete statement of the facts and, hence, in discussing the same, will only refer thereto in general terms.

In passing, it may not be inappropriate to observe that we have spent more than a week investigating this subject, and after reading text-books and adjudicated cases, have reached the conclusion that no two cases are exactly alike in all their details, and that each case must be considered in the light of the facts presented therein. This subject has been before our court many times since

its earliest history, and has been discussed with marked ability by many of the able jurists who sat upon this bench. In view of the foregoing, we will confine our discussion to a consideration of the law as promulgated in this State, and attempt to harmonize, if it can be done, the apparent inconsistences therein, or at least, to designate the rulings of this court which should be followed in cases like the one before us.

The law is well settled in this jurisdiction that the *corpus delicti* in murder consists of two elements, to-wit: (a) the death of the person alleged to have been murdered, and (b) the criminal agency of the person causing said death. Both of these must be established in a prosecution for murder, or the conviction cannot stand.

Counsel for the State, in support of their contention that the *corpus delicti* has been sufficiently shown in this case by circumstantial or presumptive evidence, cite the following cases: State v. Poor, 228 S. W. 810, 1. c. 815 et seq.; State v. Concelia, 250 Mo. 411, 1. c. 421; State v. Vinton, 220 Mo. 90, 1. c. 100; State v. Barrington, 198 Mo. 23, 1. c. 113; State v. Henderson, 186 Mo. 473, 1. c. 483. We are of the opinion, that in each of the above homicide cases, there was substantial testimony tending to show the remains or partial remains of a human being.

In State v. Poor, 228 S. W. 1. c. 812, WALKER, J., in stating the facts, said:

"On Monday, October 27, 1919, at about midnight, the barn of Charley Poor, a brother of the defendant, was burned. On the Friday following the sheriff of the county, with a number of others who had been searching for Cleve King, found among the ashes of the barn what was identified as the remains of a human being. The body had been reduced to ashes except a part of the right hip and of the thigh. From the size of the bones and the length of the entire body, as outlined in the ashes before being disturbed, the remains indicated that they were those of a small man, an adult, say the ex-

perts. Remnants of clothing and what appeared to have been buttons, which crumbled upon being touched, and a metal belt buckle, were found in the ashes with the remains. This belt buckle was identified by a number of persons as having been similar in every respect to one worn by Cleve King the day of his disappearance.''

There was strong circumstantial evidence tending to show that defendant had a serious grievance against King; that he had a gun and compelled King to start with him to the house of Hawkins, etc., to straighten up certain tales he said King had been telling on him. It was about three o'clock in the afternoon when defendant and King started down the road, and King was never seen alive thereafter. Four shots were heard that afternoon, and the fourth one was in the direction of the barn where the above remains were found. The acts, statements and conduct of defendant tended strongly to show that he killed King, and burned his brother's barn to cover the crime. The defendant was convicted of murder in the second degree, and this Division affirmed the judgment.

In State v. Concelia, 250 Mo. l. c. 415-6, a man was found dead in Kansas City, Missouri, with three gunshot wounds in his body, two of which were sufficient to produce his death. FARIS, J., on page 421, in considering this case, said:

''That the unknown man was murdered there is no doubt from the physical facts; there is not even a suggestion of suicide. The direct and positive facts, coupled with the physical facts eked out by the circumstances of the case, show a murder and not a suicide beyond cavil or doubt. But the defendant's guilty agency in the crime is the serious and troublesome question in the case. His own evasions, denials, contradictions and falsities are the most damning indications of his guilt.''

In State v. Vinton, 220 Mo. l. c. 100, Fox, J., in stating the facts, said: ''The testimony in this case shows beyond all controversy that the property designated in

the information was stolen from the J. Bolland Jewelry Company, a corporation, doing business in the city of St. Louis.'' It conclusively appeared from the evidence, that defendant was found in possession of a portion of the stolen property, had disposed of another portion, was going under an assumed name, and was not able to satisfactorily account for his possession of said property, and hence a conviction was sustained.

In State v. Barrington, 198 Mo. 23, the dead body of McCann was found with bullet holes therein, clearly indicating that he had been killed. The real controversy was over the question as to whether the facts and circumstances were sufficient to convict defendant of the murder of McCann.

In State v. Henderson, 186 Mo. 473, Joseph Buckner, on the afternoon of April 12, 1903, left his home to visit his son, and returned to his home in good health the same evening. He was living alone. That night, his house was totally destroyed by fire, and his body consumed. Early the next morning, his son discovered the charred remains of a human being, in the ashes of the burnt building. The skull and trunk of the body were sufficient to show the form of a man, and the metal portion of a knife he was known to carry was found by the body and some metal buttons. Joseph Buckner was never seen alive thereafter. [186 Mo. 477-8.] The State produced strong circumstantial evidence tending to show that Joseph Buckner was murdered through the agency of defendant.

Many other similar cases might be cited from our reports, where the death of a human being in each case was shown, and a conviction sustained on circumstantial evidence tending to show that the death in such case was produced through the agency of defendant. One of the most recent cases, in line with those discussed, is that of State v. Hall, 231 S. W. (Mo.) 1001, where many authorities are cited and reviewed. In the Hall Case, the dead body of White was found riddled with bullets. There was strong circumstantial evidence produced by the

State, tending to show a motive for the crime, and that defendant was the murderer.

After fully considering the authorities in this State, we have found but one case where a conviction was sustained without direct evidence that the dead body of a human being had been identified, and that is the case of State v. Lamb, 28 Mo. 218, where the defendant was convicted of murdering his wife, and sinking her body in the Mississippi River. Her remains were never found. In the above case, defendant Lamb, before a magistrate, under oath, made a detailed statement of the facts relating to the murder of his wife, and the sinking of her body in the river. The magistrate was produced as a witness at the trial, and testified that Lamb was informed of his rights; that the affidavit upon which he was arrested was read to him; that he was distinctly informed of the charge made against him, and that he was at liberty to refuse to answer any question put to him; that he informed Lamb that he might send for and advise with counsel; that Lamb declined doing so, and stated that he wished to make a confession. It appears from the record in said cause that strong circumstantial evidence was produced by the State, corroborating the detailed confession made by Lamb. On the morning preceding his execution, Lamb again made a statement to the clergyman in attendance and detailed the facts relating to the murder, as he had done in his previous statement. Some of the observations made by SCOTT, J., in the Lamb Case, in regard to the law relating to extrajudicial confessions, were merely *obiter dicta*, as shown by the unanimous opinion of WAGNER, J., in State v. German, 54 Mo. l. c. 530, where he recites that Lamb was convicted on a judicial confession, and not an extrajudicial confession.

In Robinson v. State, 12 Mo. l. c. 598, RYLAND, J., after reviewing the facts and law of the case, said:

"We therefore, without inserting other authorities here, which we find abundant, are inclined to support the

doctrine that the naked confessions of the prisoner, un-corroborated by other circumstances, will not justify a conviction; that the *corpus delicti* must be proved by evidence other than such extra-judicial confessions. We therefore reverse the judgment of the criminal court, and remand the case for further proceedings not inconsistent with this opinion.''

The extrinsic testimony, aside from the confession, was very much stronger in the Robinson Case than in the one under consideration, and yet the judgment of conviction based on defendant's confession was reversed and remanded.

In the case of State v. German, 54 Mo. 526, and following, WAGNER, J., in a clear and unanswerable opinion, has fully considered and discussed the question at issue here. The defendant German was charged with murder in the first degree, and found guilty of murder in the second degree. He was prosecuted for the murder of one Canaday. It appears from the evidence that he and Canaday lived together, Canaday having married defendant's mother; that on the day Canaday disappeared, the two started together in a wagon, to a corn field where they were working, about two miles distant. In the evening when defendant returned, he was alone, and when asked about Canaday said, a couple of men came along where they were at work, gave the old man a drink of whiskey, and he went with them; that there was nothing unusual about defendant's actions, and appearance; that he uniformly told the same story in regard to Canaday's absence. ''After the lapse of several months, in the woods between the house where defendant lived, and the field where he went to work when he was accompanied by Canaday, a pair of old boots and some other clothing were found, and also some bones.'' The evidence disclosed that the boots and clothes, supra, were similar to those worn by Canaday. About eight months after Canaday disappeared, defendant moved to Kansas, about forty miles from where he had previously resided.

A warrant was sworn out in Jasper County, charging him with the murder of Canaday. He was arrested by an officer, without resistance, and taken to Jasper County. On his way there, he was told by the officer that it would be better for him to confess. The defendant labored under the impression that certain witnesses were going to swear he committed the crime. He evidently believed they would convict him, and told the officer he had made up his mind not to put the county to any more expense, and would plead guilty to killing Canaday. When the defendant saw from the indictment that he was charged with first degree murder, he declined to plead guilty. On pages 528 and following, WAGNER, J., in considering the case, said:

"It will be observed that there was no evidence whatever that Canaday was murdered, except the confession of the defendant, and that was made under circumstances which rendered it inconclusive and questionable indeed whether it should have been admitted at all.

"Confessions are divided into two classes, namely, judicial and extra-judicial. Judicial confessions are those which are made before the magistrate or in court, in due course of legal proceedings, and it is essential that they be made of the free will of the party, and with full and perfect knowledge of the nature and consequences of the confession. Of this kind are the preliminary examinations, taken in writing by the magistrate, pursuant to statutes, and the plea of guilty made in open court to an indictment. Either of these is sufficient to found a conviction upon, even if it be followed by sentence of death, they being deliberately made, with the advice of counsel, and under the protecting caution and oversight of the judge. Extra-judicial confessions are those which are made by the party elsewhere than before a magistrate, or in court, this term embracing not only explicit and express confessions of crime, but all those admissions of the accused from which guilt may be implied. [1 Greenl. Ev. sec. 316.]

State v. Bowman.

"Whether extra-judicial confessions, uncorroborated by any other proof of the *corpus delicti*, are of themselves sufficient to found a conviction of the prisoner upon, has not only been doubted, but, in the best considered cases, denied. 'In the United States' says Greenleaf, 'the prisoner's confession when the *corpus delicti* is not otherwise proved, has been held insufficient for his conviction; and this opinion certainly best accords with the humanity of the criminal code, and with the great degree of caution applied, in receiving and weighing the evidence of confessions in other cases; and it seems countenanced by approved writers on this branch of the law.' [Ibid, sec. 217.]    Wharton, in his treatise on Criminal Law, lays down the doctrine in equally emphatic terms, and says that proof of the *corpus delicti*, by clear and satisfactory evidence, must always precede a conviction.    He approvingly quotes the language of Lord HALE, where that great judge said: 'I would never convict any person for stealing the goods of a person unknown, merely because he would not give an account how he came by them, unless there were due proof made that a felony had been committed.    I would never convict any person of murder or manslaughter, unless the fact were proved to be done, or at least the body found dead.' [1 Whart. Crim. Law, secs. 745-46.]    A writer of standard excellence has said: 'It may be doubted whether justice and policy ever sanction a conviction where there is no other proof of the *corpus delicti* than the uncorroborated confession of the party.' [Wills, Circumst. Ev., sec. 6.]    In murder trials, the rule laid down by Lord HALE has been generally followed, namely, that the fact of death should be shown, either by witnesses who were present, when the murderous act was done, or by proof of the body having been seen dead; or if found in a state of decomposition, or reduced to a skeleton, that it be identified by tests of the most clear and cogent character.    These authorities have frequently received the approbation of this court.    In Robinson

v. State, 12 Mo. 592, Judge RYLAND, after examining many of the cases, laid it down as the settled rule that the confession of a defendant, not made in open court, or on an examination before a committing court, but to an individual, uncorroborated by circumstances, and without proof *aliunde* that a crime has been committed, would not justify conviction." The above opinion concludes as follows:

"I think that the demurrer tendered to the evidence by the defendant's counsel should have been sustained, and that the judgment should be reversed, and the cause remanded."

The foregoing opinion, according to our conception of the law, correctly defines the rule which should prevail in cases of this character, involving proof as to the *corpus delicti.*

II.    In construing circumstantial or presumptive evidence in respect to the *corpus delicti* we should proceed upon the theory that defendant is presumed to be innocent, and that this presumption follows him until the case is finally disposed of in court. Presumption of Innocence: Duty of Court. It is the duty of the court, in the administration of the law, where a man has been convicted of homicide, to ascertain and determine from the record whether his conviction is sustained by substantial evidence. As said by this court in State v. Morney, 196 Mo. l. c. 49:

"When a conviction for felony rests altogether upon circumstantial evidence, as in this case, 'the circumstances proved must be consistent with each other, consistent with the hypothesis that the accused is guilty, and at the same time inconsistent with the hypothesis that he is innocent, and with every other rational hypothesis except that of guilt.' [12 Cyc. 488, and authorities cited.]" It is equally as well settled that a judgment of conviction based upon suspicion or conjecture should not be permitted to stand.

State v. Bowman.

Keeping in mind the principles of law which should guide us in the consideration of this case, and leaving out of consideration the alleged extra-judicial confessions alleged to have been made by defendant to Delcenia Brown and Maynard Edwards, there is no substantial evidence in the case tending to show that Estella Bowen was dead at the time of the trial below. No witness ever saw her in the basement with defendant. None of her clothes, rings, or other property were ever identified as having been found in the furnace. Estella Bowen is alleged to have disappeared on the 14th of February, 1921, and the furnace was not examined until May, 1921. The evidence is undisputed that a dead cat had been thrown into the furnace by Wesley Treweath, the butcher for the grocery store, a short time before defendant's arrest. He also testified that bones and refuse from the butcher shop were constantly thrown into the furnace. The two small bones, described by the detective, that seem to have been lost, could not certainly have been burning in this furnace from February 14th to May 4th, nor was there any evidence offered tending to show that they were a part of the human anatomy, and were not a part of the dead cat thrown into the furnace. The bones, therefore, have no place in the case. The hair pins and part of the corset stay, found in the furnace two months after Estella Bowen is alleged to have disappeared, were not shown to be her property, and the evidence is undisputed that these things were constantly swept up from the dance-hall floor, and cast into the furnace. In addition to the foregoing, it does not appear from the testimony that the foregoing things were not cast into the furnace long after the alleged murder. The above testimony is absolutely of no probative value in considering the case. The alleged blood on defendant's shirt, and the basement floor, was not analyzed, nor did any witness venture the assertion that it was human blood on either the floor or shirt. If this evidence was of any value, and was deposited on the 14th of February, 1921, the State should have had the blood examined to

determine whether it came from the chickens or from some human being. It is shown that the gloves, hand-bag and button, said to be the property of Estella, were found in the room next to the dance hall, but not in the basement. This evidence has but little, if any, probative force in determining the facts of the case, for several of the witnesses testified that Estella was *frequently* at the dance hall. We are of the opinion that aside from said alleged extra-judicial confessions, there is an entire failure of credible evidence in the record, either proving or tending to show, that Estella Bowen was killed by defendant, or any other person.

It does not appear from the record that any effort was made to find out whether she was still alive in Wyandotte, Kansas, or some other place. The jury, in giving defendant the benefit of a doubt, must have returned a compromise verdict, as appellant was either guilty of brutal, atrocious murder, or he did not kill Estella Bowen and was not guilty at all. The information charged defendant with first degree murder, and yet the jury found him guilty of murder in the second degree and gave him twenty-five years in the penitentiary. The trial judge, however, seems to have entertained grave doubts as to whether defendant had been guilty of the brutal murder charged against him, for he ignored the verdict of the jury, as shown by the record, and sentenced appellant to imprisonment in the penitentiary for a period of ten years.

Considered from every viewpoint, we are of the opinion that the *corpus delicti* was not sufficiently proven in this case, and that defendant's demurrer to the evidence at the conclusion of the case should have been sustained.

We accordingly reverse and remand the cause for further proceedings, not inconsistent with this opinion. *Reeves, C.,* concurs; *White, C.,* not sitting.

PER CURIAM:—The foregoing opinion of RAILEY, C., is hereby adopted as the opinion of the court. All of the judges concur.