**STATE of Missouri, Respondent,**

v.

**George Ben EDMONDSON, Appellant.**

**No. 55296.**

Supreme Court of Missouri,
Division No. 1.

Jan. 11, 1971.

John C. Danforth, Atty. Gen., J. Michael Jarrard, Asst. Atty. Gen., Jefferson City, for respondent.

James A. Dunn, Carthage, for appellant.

HIGGINS, Commissioner.

George Ben Edmondson, with prior conviction for robbery, first degree, was convicted by a jury of robbery, first degree, with a dangerous and deadly weapon. The court assessed his punishment at 10 years' imprisonment, credited 1,885 days' prior

imprisonment, and rendered judgment accordingly. Sections 556.280, 560.120, 560.-135, 546.615; State v. Edmondson, Mo., 379 S.W.2d 486 (conviction by jury and 30-year sentence for present offense reversed for unlawful search of automobile); State v. Edmondson, Mo., 438 S.W.2d 237 (conviction and 10-year sentence on plea of guilty to present offense set aside by trial court and affirmed upon collateral attack under Criminal Rule 27.26, V.A.M.R.).

The trial which gave rise to this conviction and appeal was in the Circuit Court of Jasper County on change of venue from Greene County. There is no contention that the state failed to make a submissible case and a brief statement supports the verdict in all respects.

The J. C. Penney Store in Springfield, Greene County, Missouri, closed on December 23, 1962, at 9:00 p. m. At about 9:25 p. m., Robert J. Costello and Donald L. Stockton, Penney employees, undertook to carry five moneybags containing several hundred dollars in receipts from the store to the night depository of Union National Bank. As they approached the bank and as Mr. Costello prepared to insert his key into the depository, they were accosted by a man wearing a trench coat and carrying a carbine rifle under his coat. They had observed the man previously standing in the doorway of an adjacent building. The assailant, backed by his rifle, directed them to drop the moneybags and go around the corner until he was gone. When they heard fleeing footsteps they returned from around the corner, found three bags missing, and deposited the two remaining. Defendant was identified by both victims from pictures and at trial as the robber. On December 25, 1962, pursuant to a telegram from Greene County Sheriff Glen Hendricks, the police and local sheriff in Albuquerque, New Mexico, arrested defendant outside his room at a motel. A search of defendant's room was made and two shaving kits containing over $4,800 were found hidden behind an inspection panel in the bathroom.

Appellant's first point is that the described search was unreasonable and in violation of his constitutional rights rendering the evidence thereby obtained and admitted at trial inadmissible. Emphasizing that no arrest or search warrants were in possession of the officers, and that the arrest was made outside the premises searched, appellant argues, "The search and seizure of evidence can be justified only so far as our laws permit a search without warrant and incident to a lawful arrest." Appellant would support his position by Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, and Shipley v. California, 395 U.S. 818, 89 S.Ct. 2053, 23 L.Ed.2d 732. It is not necessary to discuss any suggested application of appellant's citations because the search of appellant's premises has other lawful justification.

By pretrial motion, defendant sought, among other things, to suppress all evidence seized as a result of the search of the motel room. Evidence on this and the other issues so presented was taken and the court found that "the search was made as a result of the consent of the defendant given to the officers to search the apartment." The matter was reopened by defendant's new trial motion and the court found similarly that the point "is not well taken because the defendant, in effect, invited and consented to the search."

At the pretrial hearing on the motion to suppress, James R. Wheeler, one of the Albuquerque police officers, described the circumstance of defendant's arrest "for investigation of armed robbery." Defendant was handcuffed and "We asked him for identification, he showed us a driver's license, we put him under arrest. He said he didn't know what we were talking about. At that time we asked him if we could go in and search the room and he said we could. * * * He gave us permission to search the place. * * * I said, 'Do you mind if we search the room' and he said 'no.' " At no time during the search did either defendant or his wife object to the search which took twenty to thirty min-

utes. Upon cross-examination it was further elicited that Officer Wheeler "asked him if he would mind if we would search the room. Q Did you tell him what you were looking for? * * * A Ten Thousand Dollars in cash and checks. * * * Q Did you threaten him with anything in order to get his consent to search the room? A No, sir. Q Did you use force on him to get his consent? A No, sir. Q Did you promise him anything in order to get his consent to search the room? A No, sir."

During the trial, similar testimony was elicited from other officers present at the arrest and search. Lieutenant Ray Baca of the Albuquerque Police Department described the events following the arrest: "* * * we handcuffed him. And it was very cold that night, and he wasn't wearing a coat when he came out of the room. We told him that we were looking for some items in regards to a report that we got, and that we wanted to look in the motel room. * * * Then he said, 'Well, lets go on in; you are welcome to come in.' And we went in the motel room, myself and Sergeant Wheeler and Officers Sig Sanchez and Detective LeRoy Payne. * * And I told him that we had a report he had a large amount of money—And he said, 'No, I don't have any money with me, anything on me, except what I have in my pocket.' He had some bills in his shirt pocket, and 'you are welcome to go ahead and look around.'" Sheriff LeRoy Payne testified that "With the occupant's permission, George Edmondson, we searched the room. * * * Lt. Baca asked him if we could search the room. He said, 'I don't know what this is all about, go ahead.'" In response the officers entered Room 149 and were met by Mrs. Edmondson "and we apologized for the intrusion and asked her permission also to search the room because I saw then they had room 149 and 150." They were adjoining rooms. "I told her her husband was under arrest for robbery" and "asked her for permission to search it. * * * She told me to go ahead and search * * *." Lieutenant Wheeler also

testified at trial with respect to circumstances of the search. Following the arrest, "I asked Mr. Edmondson for permission to search the room and we went inside and the wife was sitting on the bed, Officer Payne also asked her if she minded if we searched the room. When the defendant was placed under arrest he said he didn't know what we were talking about and he didn't mind if we searched the room." When the defendant first emerged from the door of his room around 9:00 p. m., he was dressed and appeared awake.

The foregoing evidence demonstrates without question that defendant, freely and without coercion, gave his consent to the search of his room as found by the trial court. State v. Virdure, Mo., 371 S.W.2d 196, 200 [3]. Appellant's brief concedes that "Edmonson agreed to a search of the room." His own testimony on the motion to suppress was a denial of consent but upon cross-examination he conceded that he was "being flip" with the officers because he wasn't worried. "* * * I am pretty well convinced they didn't ask, but as I said, eight years is a long time." Such testimony simply created a conflict in testimony involving credibility of the witnesses. The trial court's rulings resolved the conflict and there was evidence to support such determination. State v. Gailes, Mo., 428 S.W.2d 555, 558.

In his second point, appellant complains that the court erred in refusing to grant a mistrial "when evidence of another crime was introduced by the State." He presents this point by asserting that when Greene County Deputy Sheriff Lee Kelso was testifying to certain purported admissions of defendant, "the witness then testified that the Defendant had purchased a rifle from Herr's Department Store in Springfield, Missouri, and as payment for said rifle, passed a bad check." Defendant objected and moved for a mistrial on the ground that this violated the general rule that " 'proof of the commission of separate and distinct crimes is not admissible, un-

less such proof has some legitimate tendency to directly establish the defendant's guilt of the charge for which he is on trial. * * * Evidence of other crimes, when not properly related to the cause on trial, violates defendant's right to be tried for the offense for which he is indicted.'" State v. Reese, 364 Mo. 1221, 274 S.W.2d 304, 307; State v. Summers, Mo., 362 S.W.2d 537, 542; State v. Mathis, Mo., 375 S.W.2d 196; State v. Holbert, Mo., 416 S.W.2d 129.

Appellant's assertion is thus presented as though the state, either intentionally, through its witness, or by volunteered statement of its witness, secured the admission of evidence of another crime. The context in which the matter arose demonstrates that the objection bore a different posture and that the trial court did not err in refusing to declare a mistrial.

Deputy Kelso, while testifying to certain statements made by defendant in his presence and, in particular, with respect to the rifle, was asked:

"Q Did the defendant indicate how he had come to have this 30 caliber carbine? Did he tell you where he got it and when he bought it or where he bought it? A Yes. Q What did he tell you about that? A He bought it at the Heer's Department Store in Springfield, Missouri and gave them an insufficient funds check."

Several impressions, contrary to appellant's assertion, are thus shown to appear. First, there was no objection to the question and it indicated the type answer made. Second, the testimony is of an admission or statement in the words of defendant with respect to the rifle. Third, the statement "gave them an insufficient funds check" does not, of itself, constitute evidence of another crime. See Section 561.460, V.A. M.S., describing the offense that may flow from checks or drafts drawn when funds are insufficient, and Section 561.470, V.A. M.S., providing how the intent to defraud by such an instrument is established. Fourth, the court did not simply overrule

the motion for mistrial but proceeded: "However, the statement will be ordered stricken and the jury will disregard it. The last statement of the witness is stricken from the record and the jury will disregard it." The drastic remedy of declaring a mistrial rests within the discretion of the trial court, and the appellate function is to determine whether, as a matter of law, the trial court abused its discretion in refusing to declare a mistrial. State v. Nolan, Mo., 423 S.W.2d 815, 818–819; State v. Madden, Mo., 394 S.W.2d 317; State v. Allen, Mo., 343 S.W.2d 63; State v. Virdure, supra. It may not be said on this record that the trial court abused its discretion in refusing to declare a mistrial.

Next, appellant charges the court erred in admitting into evidence over timely objection testimony of purported admissions made by this defendant to police officers in Albuquerque, New Mexico, and purported admissions made to Deputy Kelso.

There are no transcript references to show the testimony and objections against which this assertion is made; however, the gist of appellant's position is that "no foundation was first made before these officers were asked to relate the substance of any statements the Defendant made." Appellant "does not contend that the principles as laid down in the Miranda and Escobedo cases concerning warnings which must be given before any confessions are admissible, applies * * * to this case. * * * Defendant does seriously contend that even before Miranda and Escobedo some foundation must be laid * * to show that the statements made were voluntarily made by the Defendant." See State v. Brown, Mo., 436 S.W.2d 724, 726 [3].

■ The proper rule in this case is "'whether the totality of circumstances deprived the defendant of a free choice to admit, to deny, or to refuse to answer, and whether physical or psychological coercion was of such a degree that the defendant's will was overborne at the time he

confessed. One datum of importance bearing on the inquiry is the presence or absence of advice concerning the defendant's constitutional rights' * * * 'prior to Miranda, the prevailing rule was to the effect that extrajudicial confessions were not rendered inadmissible or involuntary by reason of the failure to caution the accused that he need not talk and that, if he did, what he said would be used against him. While under this view failure to inform a defendant of his rights was, of itself, not sufficient to render a confession involuntary, such failure was held a factor, among others, to be taken into consideration, in determining the voluntariness of a confession.'" State v. Glenn, Mo., 429 S.W.2d 225, 232–233[8, 9]; State v. Smith, Mo., 415 S.W.2d 748, 750[1]; State v. Montgomery, Mo., 424 S.W.2d 744, 745; State v. Nolan, supra, 423 S.W.2d l. c. 817.

■ The first evidence with respect to this issue was elicited at the pretrial hearing on defendant's motion to suppress certain testimony on defendant's admissions. Other testimony concerning defendant's admission was elicited during trial at times when such testimony was offered, objected to, or admitted as the case might be. Recital of such evidence demonstrates that the State met any burden it may have had, State v. Gower, Mo., 418 S.W.2d 10, 13 [1], to prove any incriminating statements to have been voluntarily made by defendant. At the pretrial hearing Officer Wheeler, in addition to describing the circumstances of defendant's arrest and consent to search his room, testified that "he was advised of his rights by Payne. We didn't do it as fancy in those days as we do now. We told him he didn't have to say anything, he had a right to hire an attorney." He stated there was no force used to get defendant to make any statements, and there were no threats, promises, or physical violence employed. Only one gun was drawn at the time of arrest and no weapons were present after the defendant was handcuffed. Deputy Kelso also testified at the pretrial hearing with respect to the

circumstances present during the train ride from Albuquerque to Springfield when he and Sheriff Hendricks brought defendant back to Missouri. The trip required some 24 to 36 hours, and defendant was watched in turn by the officers but not restrained. He was permitted to sleep and no effort was made to keep him awake, nor was there any plan to alternate in questioning him. Most of the discussions were 3-way conversations and the principal admission came following a question asked by defendant of the officers. There was no force or threat used on him at any time. Officer Wheeler's testimony at trial with respect to admissions was that no force, threats, or promises were employed prior to questions asked of defendant, and he appeared awake. Deputy Kelso at trial also testified to an absence of force, threats, or promises, and that defendant's principal incriminating admission was not a result of questioning but volunteered by defendant. He was permitted to sleep and eat and no physical duress was employed. Detective Payne testified that defendant was "approached" for arrest by "Wheeler, myself and Lt. Baca. He was told he was under arrest. I handcuffed him. While I handcuffed him I told him not to say anything. Upon being booked down at the station he would be allowed to make a phone call." There was no use of physical force to get defendant to make a statement; no threats or promises were made as inducements to talk. Defendant was awake and his responses indicated understanding.

Under the foregoing circumstances and under the pre-Miranda test, it may not be said that defendant's will was at any time overborne by physical or psychological coercion, or that he was deprived of a free choice to speak or be silent. As in the matter of the search, defendant emphasizes his own testimony which conflicts with that of the officers; but the conflicts have been resolved and the court's rulings are shown to have been supported.

■ Finally, appellant seeks a new trial on his assertion that a "juror's misconduct

by disregarding the admonishment of the court and discussing the merits of a case prior to submission to the jury constitutes prejudicial error."

This matter first came to the court's attention by appellant's motion for new trial and the court held a hearing on the motion and, in particular, on this charge. Its nature is best shown by the testimony of the juror and the witness involved.

The juror, William Anthony Palmer, testified:

"Q  Now the Court recessed on Tuesday afternoon to reconvene on Wednesday morning, do you recall that?  You recall, Mr. Palmer, where you went immediately after the Court recessed Tuesday evening? A  Yes, sir.  Q  Would you tell us where? A  To my automobile out on the parking lot.  Q  When you got in your car did you go anyplace in particular?  A  Yes, I went to the Sands Motor Lodge.  Q  That is located on Range Line?  A  To the cocktail lounge.  *  *  *  Q  Do you recall whether or not a woman by the name of Mayme Huff had testified in this case? A  Yes, I do.  Q  Did you see Mrs. Huff any time Tuesday the 30th after this Court recessed?  A  Yes, I did.  Q  Where did you see her, Mr. Palmer?  A  At the Sands Cocktail Lounge.  Q  Do you recall whether you got there first or whether she got there first?  A  I was there first.  Q  Do you recall seeing her come into the lounge? A  Yes, I do.

"Q  When she did that, Mr. Palmer, would you tell the Court what you did? A  Well, I was having a drink at a different table than she was and then first I didn't recall who she was, then I remembered she had been in the Courtroom as a witness.  Q  Did you go over to her table? A  At her request I did.  Q  All right, sir. And did you then engage in any conversation with this witness?  A  Yes, among other things she said she was a manager of the Howard Johnson—I believe Howard Johnson or Holiday Inn Cocktail Lounge in Springfield.  Q  That came out in evidence in the case, didn't it, Mr. Palmer? A  Well, I thought at the trial that she was in another place in Springfield.  Q Let me ask you this question, Mr. Palmer: Did you and Mrs. Huff have any conversation concerning Mr. Edmondson?  A  Yes, we did.  Q  Did you discuss the testimony which she had just given in the Courtroom? A  To my knowledge I never.  She said she had known Alex all of his life and I was interested in his youth.

"Q  Did you talk about things affecting Mr. Edmondson that were not introduced in evidence in this case?  A  Well, it is possible.  Because what I was talking about was his younger days.  Q  Was this conversation about his younger days?  A  As I recall that was what—Q  Initiated by you or by Mrs. Huff?  A  I don't remember who started the conversation.  I remember her saying she had known him all of his life practically.

"Q  How long, Mr. Palmer, were you there with Mrs. Huff at the Sands Cocktail Lounge Tuesday evening?  A  I think we probably had two drinks and then Mrs. Huff said she was hungry, her and her lady friend with her were going to get something to eat and I stayed there.  Q Have you estimated just your best guess how long you stayed there and talked with her?  A  It would be a rough estimate but I would say 20 minutes  *  *  *

"CROSS  EXAMINATION  BY  MR. CROW:

"Q  Did you tell Mrs. Huff that you were on the Jury whenever you first went over to her, when she first came in?  A  I don't recall if I did or not.  I believe she knew I was.  Q  Did you go to her table or she come to your table?  A  I went to her table  Q  You went to her table.  And on the way over to her table did it occur to you that one of these two ladies had been a witness?  Did you know that when you were going over to her table?  A  I probably did.  Q  Well, you knew before you said anything to her that she had testified as a witness in this case?  A  (Affirmative

nod.) Q Is that correct? A Yes. Q You knew that without her telling you? A Yes, I remembered seeing her in the Courtroom. Q Did she say anything to you to the effect that you were on the Jury and she didn't know whether she could talk with you or not? A I don't remember if that statement was made or not.

"Q Do you remember asking her whether she thought Edmondson was innocent? A No, I don't. Q Do you remember her telling you that Edmondson had been in her car after he left the Esquire Lounge the night of December 23, 1961? A Would you repeat it, please? Q Do you remember her telling you that Edmondson had been in her car after he left the Esquire Lounge December 23, 1961? A Not specifically. I might be mixed up there because I remember something about this coming up at the trial. Q That is what I am trying to find out, did you pursue this point with her at the cocktail lounge after leaving the Court that day? A I don't believe I did. You see I do a lot of work with young people and I was interested in his youth and that was what I was asking questions about. Q What type work is it you do with young people? A Well, for one thing I am director of the Demolay in Joplin. And then I am interested in young boys.

"Q What did she tell you about the defendant's younger life? A Well, this is what I remember about this, she said that it was her knowledge that he had done little things that were just mischievous things that most boys do and that certain persons in the sheriff's department in Springfield had taken this wrong, that they had pursued him practically all of his young teen years while he was a teenager for one reason. She said the things he had done were what a lot of young boys do, mischievous-type things and that she thought he had been unjustly pursued by the sheriff's department. Q Did she tell you she thought he had been unjustly pursued by law enforcement? A When he was a young boy. Q So in essence she was telling you

things which would have been favorable to him, correct? A It didn't occur to me, at the time. Like I say, my mind was on a different trend of thought. I guess you could say they were.

"Q Now later on at the trial the defendant himself testified as to his background, did he not? A Well, I don't recall him testifying about when he was a youngster. * * * Q Did it occur to you at the time you were talking with her that this was something you probably should not have been doing? A No, it didn't. I didn't think that a boy's youth would enter a case or I surely wouldn't have done it. It is not my intention to do something wrong. Q Did you report any of what you had discussed with Mrs. Huff to any of the other jurors. A No. Q Either during the trial or during deliberation? A No.

"Q Did what you learned from Mrs. Huff, have any bearing on your decision as a juror in this case? A No, sir, it surely didn't. As you recall I was foreman of the jury and it was a unanimous guilty verdict. Q Do you think you would have reached a guilty verdict had it not been for your conversation with Mrs. Huff? A Yes I do, because the verdict was based on evidence presented here in Court and that was what I was working on.

"Q You told none of the other jurors any of the things you had discussed with Mrs. Huff outside the Courtroom, correct? A That is right. * * * Q Did you ever report to anyone else that you had had this conversation with Mrs. Huff? A No. I didn't think it was necessary. Q You didn't tell the jurors? A No. Q You didn't tell me? A I don't think I did. No. Q You didn't tell me, did you? A No, sir. Q You didn't tell Mr. Dunn? A I don't believe I told anyone. Q Well, you kept this to yourself until after the trial was over and the verdict in? A (Affirmative nod.) THE COURT: Answer audibly. A Oh, yes. Q You told no one then until after the verdict was in. Is that correct? A Right. Q And none of the things that

you and Mrs. Huff talked about had any bearing on your judgment as to whether Edmondson was guilty or not guilty on the charge we were trying him on, correct? A Correct. Q You testify you would have reached the same verdict had you not had the conversation with Mrs. Huff? A That is correct. After I talked to her I turned in a guilty for it being based on the evidence that was presented in the Courtroom. * * *

REDIRECT EXAMINATION BY MR. DUNN:

"Q Mr. Palmer, after having this conversation with Mrs. Huff did you form any opinion in your own mind as to whether this man was innocent or guilty prior to coming to Court that following day? A Well, my opinion as to the case was reached after the case was finished being presented. Q That would mean after you talked to Mrs. Huff you had still a complete open mind about the case. A Well that—I couldn't let that enter into my mind, something that happened outside the Courtroom. Q All right. What Mrs. Huff actually was telling you was incidents where this man was guilty of mischief, is that right? A Yes. I mean he was a young teenager. Nothing—she said nothing serious, just mischievous things average boys do. Q Did she go into any details or particulars about what is mischief and what is not? A No, sir. Q Did she tell you specifically what she meant by mischievous items? A No, and I didn't ask. * * *

"THE COURT: Did any of the other members of the Jury know that you had talked to Mrs. Huff? A To my knowledge they did not, sir. THE COURT: Did you tell any of them you had? A. No. THE COURT: And it is my understanding that there was no mention at that time to the other members of the Jury as to the fact (1) that you talked to Mrs. Huff or (2) what Mrs. Huff had told you. A No sir, I don't recall mentioning that to a single soul."

The witness, Mayme Huff, testified:

"Q Are you the same Mayme Huff who testified in the case of State of Missouri versus George Ben Edmondson on Tuesday, September 30 this year? A Yes, sir. Q Mrs. Huff, do you recall leaving the Courthouse after your testimony was completed? A Yes, sir. * * * Q Do you recall making any stop in Joplin, Missouri prior to leaving town and on your way back to Springfield? A Yes, I stopped. Q Are you acquainted with the Sands Cocktail Lounge in Joplin? A I wasn't then. I am now. Q Do you recall whether or not you stopped at that establishment? A Yes, I did.

"Q Now do you know a gentleman by the name of William A. Palmer? A I do now. Q Did you on the 30th of September? A No, sir. Q Did you recognize a gentleman inside the cocktail lounge that you had seen earlier that day? A I didn't remember seeing him earlier that day. After we were inside this lady friend of mine told me he was on the Jury. Q Where was Mr. Palmer when she told you that? A We were going in the door together, all three of us. Q All three of you? A Yes.

"Q When you got inside did you and your companion take a table? A Yes, we did. Q What about Mr. Palmer? A Well, as we came in the door there was no place to sit except this one little table just inside the door. I suppose he had the same idea we did, that table just happened to all three of us sit there. Q You sat at the same table. While there, Mrs. Huff, did any conversation develop about Mr. Edmondson? A Not very much. No, it hadn't been mentioned but this girl friend of mine was punching me when we sat down at the table and told me this man was on the Jury. I asked him at the time if he had been and he said yes he had. I said 'Do you think you would get in trouble sitting here talking?' He said 'You have already finished testifying, they are finished with you. I don't suppose it would hurt if we sat together.' Q How long did you sit there? A We had a couple

of drinks, myself, I was talking to someone I knew from Springfield and he was talking to another guy, wasn't much conversation going on.

"Q Do you recall any details of the conversation at all? A About this case? Q Yes, Ma'am, about this case. A Oh, I think I spoke up that I hope this ended it today, I would have to take off work to come back, and he said 'I wouldn't worry' and that was about the extent of it. We were talking about some people that came in at the bar where I worked down home that he knew.

"Q Do you recall whether or not Mr. Palmer directed any questions to you concerning Mr. Edmondson's past, his youth? A I don't remember exactly any questions he asked me. I probably mentioned to him I had known him for a long time. Q Do you specifically recall him asking you any questions about the testimony that you had just given? A No, I don't remember anything out of the ordinary. I mean anything that wasn't heard here that day. * * Q Did Mr. Palmer indicate to you that he was a member of the Jury and he should not talk to you or he was told not to talk to you? A He and Marjie, this lady friend of mine, was talking. He could have told her after she told me he was on the Jury. I asked him if it mattered if we sat together and he said 'I don't think so, you have already testified.' * * *

"Q Did you overhear any conversation that she and Mr. Palmer had about this case? A No. They—I think they were talking but I don't know of anything. I think Mr. Palmer said that I shouldn't worry or something, or everything was going great or going well, something like that. Q Did he ever express an opinion one way or another he felt Mr. Edmondson was guilty or not guilty of the charge, to you at the Sands Motel? A Oh, I think maybe he—well, I don't know that he said anything, no. I felt like he was kind of for him. Because he—Q Just from what he had said or the way he said it rather

than what he said? A And Mrs. Meyer going home said I shouldn't worry, she believed he would win.

"CROSS EXAMINATION BY MR. CROW:

"When did you tell Mr. Dunn about this conversation that you had with Mr. Palmer? A I didn't get to see either one of you gentlemen when I left the Court that day and I called Mr. Dunn from Hidden Acres when I stopped to get a cup of coffee and a sandwich to go. I believe you were there. Q Yes, I think that is where I ate that night, but I don't recall seeing you. Did you come by my table and say anything to me? A No, I was sitting at the bar and I think you left while we were there. Q I was there with my assistant, Mr. Wampler, was I not? He was the other man with me? A Yes. Q He was the same man at the table with me in the Courtroom? A I don't know about that. You were with a man. Q One other fellow? A I believe that is correct. Mrs. Meyer told me that was you. I didn't even pay any attention, getting a sandwich and going—I think about the time to pay for it when she said that you walked out.

"Q Was that when you called Jim Dunn? A I called him before we left, yes. I had ordered a drink and a sandwich and some coffee to go. Q You called him while you were at the Hidden Acres? A Yes. Q That would have been how long after you talked with Mr. Palmer? A Oh, it couldn't have been too long because I went on down the street. We stopped at another place, we hadn't seen the Tropics and we stopped in there. There was some people in there we knew and talked to them and went to the rest room and went on to Hidden Acres. Q That would have been an hour or so after you talked to Mr. Palmer, correct? A Probably an hour. Q Then of course it would have been on the same day you talked to Mr. Palmer. A Yes, I was only here one day. Q That would have been Tuesday, September 30th,

correct? A That was the day we had the trial that I testified here, yes.

"Q You called Jim Dunn before you left Joplin and went back to Springfield? A Yes. I didn't get to tell him goodbye before I left the Courtroom. I didn't see him. Q Now in your telephone conversation with Jim Dunn did you tell him you had had this conversation with Mr. Palmer? A Yes, I told him I had run into one of the guys from the Jury. I didn't know at that time who he was but I had had a drink with him and he thought things were going pretty well. He said he didn't think I should worry. I don't know whether he referred me to come back over and testify or if the trial was going well.

"Q So you told Mr. Dunn of your conversation with Mr. Palmer within an hour of that conversation, correct? A It could have been an hour and a half. Q All right. A But it was close. It was the same day, yes. Q The same day. After the second day of trial? A I don't know how long the trial had been going on. It was the same day I was here to testify. Q You were a defense witness in this trial, were you not? A Yes. Q Not called by the State? A No. The other day, I mean at the time I was here you were talking about? Q Yes, at the trial you were a defense witness. * * *

"Q Is it a fair statement to say that over all the years since this case occurred you have felt Mr. Edmondson was not guilty of this? A Is that a fair statement? Q Is that a fair statement of your belief and the belief you have held all these years? A Well, everyone has their own opinion. No, I don't think he is guilty. Q And in your conversation with Mr. Palmer if you said anything to him it would have been something that would have been to your knowledge and thinking favorable to Edmondson, would it not? A That is true. Q Nothing that would have helped convict Edmondson? A No. Q Because you don't think he is guilty, you just testified to that. A True."

The court found on this testimony that "The actions of the juror Palmer in talking to and obtaining information from the witness Huff were not prejudicial to defendant. The witness was a defense witness, favorable to the defendant and did not believe defendant to be guilty. The juror testified that he got only information concerning defendant's past which included information that the witness felt the Greene County Sheriff's office had unjustly harassed the defendant for minor mischief. The juror did not impart any of such information to the other jurors and, according to him, was disregarded by him in arriving at his own decision. Again the cases cited by defendant do not apply. The situation would seem to be within the discretion of the Court under the ruling in State v. O'Neal 426 [436] S.W.2d 241."

Section 547.020, V.A.M.S., provides that the court may grant a new trial if a juror has been guilty of misconduct tending to prevent fair and due consideration of the case; and Section 546.230, V.A.M.S., permits separation of the jury prior to submission of cases other than capital cases, and provides that when so permitted, the jury shall be admonished at each adjournment that it is the jurors' duty not to converse with themselves, nor to suffer others to converse with them or in their bearing on any trial subject, or to form or express any opinion on the case until it is finally submitted for deliberation and verdict. This latter statute has been consistently interpreted as in State v. Dodson, Mo., 92 S.W.2d 614, 615[1]: "* * * that if the separation or misconduct of the jury took place during the progress of the trial, the verdict will be set aside, unless the state affirmatively shows that the jurors were not subject to improper influences. But if after the case has been submitted to the jury for its determination, and before a verdict has been reached, there is an opportunity that improper influence could be used on any juror, that alone will require a new trial, even though it be shown that improper influence was not

exercised." See also State v. Jones, 363 Mo. 998, 255 S.W.2d 801, 806 [8].

■ It is the first of the two situations involved in the alleged misconduct of juror Palmer. In that circumstance the relevant question is whether the defendant was prejudiced or that the juror was subjected to any improper influence, State v. Bayless, Mo., 362 Mo. 109, 240 S.W.2d 114, 123 [14–17]; and the trial court has the discretion to determine whether the circumstances require mistrial. State v. O'Neal, Mo., 436 S.W.2d 241, 246[9].

This is the type of incident that all trial judges would avoid and the record in this case is replete with unmistakable admonishments by the judge. Nevertheless, the incident did arise and the experienced trial judge caused the matter to be fully aired in a hearing at which both the juror and the witness involved were examined in detail, as demonstrated, by both counsel and the court. The facts were frankly disclosed and they conclusively demonstrate an absence of prejudice to the defendant and of influence on the juror in question or on the verdict. If the encounter had any impact whatever it was that of influencing the juror to the side of the accused; however, the unanimous verdict totally refutes any such tendency. The same facts also support the judge's discretionary finding against granting a mistrial, and it may not be said that this record shows any abuse of the discretion lodged in the trial court.

Judgment affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All of the Judges concur.