**STATE of Missouri, Plaintiff-Respondent,**

**v.**

**Gary AMBUS, Defendant-Appellant.**

No. 35763.

Missouri Court of Appeals,
St. Louis District,
Division Three.

April 8, 1975.

Charles D. Kitchin, Public Defender, Edwin H. Steinmann, Jr., Henry J. Rieke, Asst. Public Defenders, St. Louis, for defendant-appellant.

John C. Danforth, Atty. Gen., K. Preston Dean, Asst. Atty. Gen., Jefferson City, Brendan Ryan, Circuit Atty., Mark A. Brown, Asst. Circuit Atty., St. Louis, for plaintiff-respondent.

SIMEONE, Presiding Judge.

Defendant-appellant, Gary Ambus, was charged with assault with intent to rob with malice aforethought, found guilty by the jury and sentenced by the court to thirteen years in the department of corrections. He appeals. For reasons hereinafter stated, we affirm.

Since appellant does not question the sufficiency of the evidence, only those facts pertinent to resolve the points on appeal need be stated.

On the morning of September 25, 1972, Walter Westerhold, the manager of Bonified Oil Station located at 454 North Skinker Boulevard in the City of St. Louis opened the service station for the day's business. He opened the station about 8:00 a. m. At about 8:25 a. m., when he was at the gas pumps, he noticed a person, later identified as the appellant-Ambus, outside the station by the soda machines. He also noticed another person, identified as Robert Young, inside the station. He approached Ambus and asked what he could do for him. Ambus stated that "he wanted a pack of cigarettes." Westerhold walked into the station to the "back room door where the cigarette rack was hanging on the door." Ambus followed him into the station. Westerhold then asked Young what "I could do for him." He stated that "he needed a can for gasoline." Westerhold noticed that Young had a gun in his belt under his jacket. Westerhold then decided to go inside the store room and "try and slam the door behind me. . . ." As he did so, the two men "burst through the doorway" and "both had weapons in their hands." Ambus had a "blue steel automatic."

Westerhold tried to slam the door and "they both kind of threw the door back open and they fired." They said, " 'Let's have the money' or something to that nature." Ambus fired a shot. Westerhold jumped to the back of the store room where "I had a gun laying on the oil" cans, and fired back five shots. Both men ran from the station. They went halfway across the lot and then turned around and came "right straight back." Westerhold at that time was trying to call the police. When the men started coming back, he fired a shot through the window and shot Ambus. Both men then continued to go south on Skinker Boulevard. Westerhold called the police. Within minutes, Officers McLaughlin and Sexton came to the station. McLaughlin observed blood on the

ground and followed the trail. About 45 feet away on the sidewalk, he found a pistol (.32 automatic) which was identified as the one Ambus carried. Officer McLaughlin examined it and could "faintly smell what appeared or what I sensed to be a recently fired weapon and there was a bit of heat on it which would indicate that it was, indicate possibly was just recently fired." "It was a strong smell."

Officers Dember Bonds and Jack Billings also came to the service station. When Bonds arrived, he observed Officer McLaughlin holding the .32 caliber automatic. Bonds and Billings followed the trail of blood, which led to 6145 Waterman, about two blocks away. Other officers also came upon the scene. Officer Robert Wencewicz followed the trail of blood to the Waterman address. When Wencewicz reached that address, he went in with gun drawn and found the defendant partially under a bed. Officers Bonds and Billings also entered the room. They found the defendant was injured. He "might have been in a state of shock . . . ." His hand was wrapped in a towel, and when uncovered his thumb was "almost off, it was just hanging." Officer Wencewicz did not remember "the man saying anything." In the room also there was Officer Richards with a police dog.

Officer Billings advised Ambus of his Miranda rights; Ambus responded and said "he knew his rights." Billings then asked him what happened, and Ambus said he "hurt his thumb when we hit the place up the street." Ambus was quiet and spoke in a low tone of voice. A cruiser was called for, and Ambus was taken to the hospital. He had been shot several times—in the right front chest area and in the upper right back area.

In due time, the defendant was tried on August 27, 28 and 29, 1973. In that trial, the jury could not reach a verdict. Trial was then reset for September 24, 1973. On the preceding Friday, September 21, counsel for the defendant filed a motion to produce a transcript of the previous trial, alleging that the defendant was indigent and that he needed the transcript to "properly retry said cause." Failure to provide the transcript, it was alleged, would result in "fundamental unfairness. . . ." In an affidavit filed with the motion, counsel stated that on the previous day the defendant expressed his intention to maintain his plea of not guilty, although earlier he had indicated he would plead guilty. The motion was denied by the judge in the assignment division.[1]

The trial judge below adopted the ruling of the assignment judge and also overruled the renewed motion to produce a transcript of the previous trial.

Prior to the first trial, defendant moved to suppress any statements made by him on the ground that they were not voluntarily and intelligently made. A hearing was held on the motion and was overruled. The trial judge below at the beginning of the second trial also adopted the ruling and denied the motion to suppress statements made by the defendant.

Trial was then held on September 24–26, 1973, and the facts as stated above were adduced.

1. The judge denied the motion for the following reasons:

" 'One, it was not presented until after noon on Friday, September 21 and this case is ready to be assigned for trial on September 24 and therefore not timely filed.

Two, the Motion does not show that it is necessary for the trial of the case, nor in what way it is necessary in order for the Defendant to obtain a fair trial.

Three, this Court has the responsibility of disposing of cases within a reasonable length of time, and to permit this Motion to become grounds for continuance would bring about great delay in our cases on the docket.

Four, to permit this to become grounds for continuance (because the Defendant changes his mind at the last minute) would result in many other defendants taking a like action, as it is a matter of common knowledge that such happenings as this become a matter of common knowledge to all confined prisoners.

This is the eighth setting of the case. So ordered.' "

During the defendant's case, counsel called the court reporter in the first trial. She testified as to certain differences in the testimony of Officer Wencewicz from the first trial. Counsel also called Officer Bonds, who wrote the police report, as his witness. He testified that although Ambus had made a statement to Officer Billings concerning how his thumb was hurt the statement was not in the report because of an error.

When the evidence was completed, the court gave several instructions including a "flight" instruction.[2]

On this appeal, defendant contends that the trial court erred (1) in denying the defendant's motion to produce the transcript of the first trial for the reason that defendant was thus deprived of his right to adequate cross-examination, equal protection and effective assistance of counsel during the second trial; (2) in overruling the motion to suppress statements because they were not made voluntarily or after an intelligent waiver of his right to remain silent; and (3) in giving the flight instruction because there was no evidentiary support for the giving of the instruction.

As to the first point, appellant argues (1) that his attempts to impeach the state's witnesses were impeded because of the absence of the transcript of the first trial, hence the transcript was valuable to him; and (2) that alternative devices were not available. Appellant relies on Britt v. North Carolina, 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971), and its progeny as authority for the proposition that he is entitled to the first trial transcript.

In Britt, supra, petitioner was tried for murder. The first trial ended in a "hope-less deadlock." A retrial was then scheduled for the following month. In the interim, petitioner filed a motion alleging he was indigent and requested a free transcript of the first trial. The North Carolina appeals court affirmed the denial of the motion, stating that the record did not reveal a sufficient need for the transcript. The Supreme Court of the United States granted certiorari. The court held that, while the principle of Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1955), is applicable, no violation of that rule has been shown "in the narrow circumstances of this case." The court stated that "Griffin v. Illinois and its progeny establish the principle that the State must, as a matter of equal protection, provide indigent prisoners with the basic tools of an adequate defense or appeal, when those tools are available for a price to other prisoners. While the outer limits of that principle are not clear, there can be no doubt that the State must provide an indigent defendant with a transcript of prior proceedings when that transcript is *needed* for an effective defense or appeal. . . ." (Emphasis added). 404 U.S. at 227, 92 S. Ct. at 433.

There are two relevant factors, the court stated, to determine need: (1) the value of the transcript to the defendant and (2) the availability of alternative devices that would fulfill the same function as a transcript. As to value, the court agreed that there would be serious doubts of the North Carolina decision if it rested on the failure to specify "how the transcript might have been useful to him." The cases recognize value to a defendant "without requiring a showing of need tailored to the facts of the particular case." Value exists either

2. INSTRUCTION NO. 8:
" 'The Court instructs the jury that if you believe and find from the evidence, beyond a reasonable doubt, that the defendant immediately or shortly after the incident described in the evidence fled or attempted to flee from the scene for the purpose of avoiding arrest and trial for an offense, if you find an offense was committed at the time in question and that the defendant committed it, then such flight, if you find he did so flee, is a circumstance which may be taken into consideration by you in connection with all the other facts and circumstances in the case in determining his guilt or innocence of the charge placed against him in the amended information, and unless you so find the defendant fled or attempted to flee for the purpose of avoiding arrest and prosecution in this cause then you shall not consider the same in arriving at your verdict.' "

as a discovery device in preparation for trial or for the impeachment of witnesses. The Supreme Court affirmed the denial of the transcript, because the North Carolina court rested its decision on the "availability of adequate alternatives to a transcript." The second trial was before the same judge, with same counsel, the same court reporter, and the two trials were only a month apart. The trial court suggested that the memory of petitioner and his counsel should have furnished an adequate substitute for the transcript, and in addition the petitioner could have called the court reporter to read to the jury the testimony of the previous trial. While the court rejected the suggestion that counsel must keep exhaustive notes of the testimony at trial or have a perfect memory, during the oral argument on appeal, it "emerged" the petitioner could have had the reporter read back to counsel his notes of the mistrial in advance of the second trial if "counsel had simply made an informal request."

There are striking similarities between *Britt* and this cause. The first trial was tried by the same defense counsel, the two trials were held less than a month apart, the trial was held in the same city, counsel for defendant did have the reporter read some discrepancies in the testimony to discredit the witness, and counsel in this case did not informally request the reporter to read the notes back to him.[3]

■ We hold the trial court did not err in denying the motion to produce the transcript in the circumstances of this case. First, the motion was not timely filed.

The trial court denied the motion on the ground, inter alia, that the motion was not presented until after noon on the Friday before the case was set for trial, and because "[t]his is the eighth setting of the case." Delay in seeking similar evidence has been held to be grounds for refusing a requested continuance. State v. Brown, 480 S.W.2d 843 (Mo.1972) [deposition].

■ Secondly, we believe that the circumstances of this case are analogous to *Britt,* in that there were available alternative devices that fulfilled the same function as a transcript. As stated, the first trial was tried by the same defense counsel, the two trials were held only a month apart, counsel did not request the reporter to read the transcript to him during the two or three days prior to trial on September 24, 1973. Trial was held in the same city, counsel did as a matter of fact have the reporter in the first trial read certain portions of the first trial in an attempt to discredit certain witnesses, counsel during the cross-examination of the victim referred to matters he stated in the previous trial.[4]

Under these circumstances, we hold that the trial court did not err in denying the motion to produce the transcript at state expense.

■ There is no equal protection problem here. The appellant was not denied the transcript because he was indigent. The trial court in the exercise of its discretion denied the motion on other grounds.

3. Counsel for defendant was asked by the trial judge: "Did you have the court reporter read the notes back to you?" A. "No." "Why not?" The attorney answered: "Following this trial and not having yet the opportunity to talk to my client, I had to be up in 17 on another matter because I was assigned out to trial again. I talked to the court reporter and said I wanted to get a transcript at that time. I didn't realize my client was going to plead guilty and that the offer would be reduced. She informed me that I could get the transcript in about four months."

4. United States v. Young, 472 F.2d 628 (6th Cir. 1972), holds that defendant is entitled to a transcript of the first trial. One of the reasons given by two judges of a three-judge panel (one dissented) was that the record did not reflect that the trial court made any reference to the availability of the court reporter to read back the testimony of the first trial until an order made three months after the conclusion of the second trial. Furthermore, there is no indication in the case that witnesses were attempted to be impeached or that the court reporter was called to testify as to statements in the first trial.

Defendant next contends that the court erred in denying the motion to suppress his statements relating to the injury to his thumb. He contends the statement in answer to Officer Billings' question "What happened to your finger?" that Ambus said he "hurt his thumb when we hit the place up the street," should have been suppressed because the defendant did not knowingly, intelligently and voluntarily waive his right to remain silent after being given the Miranda warnings. He contends that under the circumstances at the time of the warnings—(a) defendant had been shot, (b) he was alone surrounded by officers, (c) one officer had his weapon drawn, (d) his left hand was wrapped in a towel, (e) his left thumb was almost severed, (f) a police dog was somewhere nearby—the totality of circumstances surrounding the arrest was such that defendant, in pain, and under mental and psychological pressure, could not make an intelligent waiver of his right to remain silent. He relies on Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), and State v. Edmondson, 461 S.W. 2d 713 (Mo.1971).

■■■ Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), requires that the waiver of constitutional rights must be given voluntarily, knowingly and intelligently. Whether there is such a waiver depends upon the totality of the circumstances of the case.

■■■ Defendant was given the standard Miranda warnings, he indicated he understood them and "knew his rights," and thereafter Officer Billings asked, "What happened to your finger?" The defendant despite his injury was quiet and spoke in a low tone. *Schnechloth* involved a consent search, but the Supreme Court thoroughly discussed the question of voluntariness. The ultimate test is whether the will was overborne in the totality of the circumstances. In State v. Edmondson, supra, 461 S.W.2d at 717, our Supreme Court stated that the proper rule is whether the totality of the circumstances deprived the defendant of a free choice to admit, to

deny, or to refuse to answer, and whether physical or psychological coercion was of such a degree that the will was overborne at the time he made a statement. One datum of importance is the presence or absence of advice concerning the defendant's constitutional rights.

■■■ We do not believe that the trial court erred in denying the motion to suppress the statement. Appellant was advised of his rights, he indicated he understood them, the officer testified he was quiet and spoke in a low tone. The fact that the defendant was wounded does not preclude a waiver or make the statement involuntary. We know of no constitutional prohibition against a seriously wounded person making a statement. State v. Granberry, 484 S.W.2d 295, 300 (Mo.banc 1972).

There was adequate evidence which could be found to be a waiver of the right to remain silent. The appellant answered that "he knew his rights" after being informed of them by Officer Billings. The officer did not inquire about the crime, but his inquiry was directed to his injured hand. The appellant was lucid, he was able to converse enroute to the hospital with the officer who accompanied him.

Previous cases in Missouri and other jurisdictions have dealt with the issue of psychological stress, impaired judgment and voluntary statements. Recently, this court held that a suspect's statements were voluntarily made despite the fact that he was intoxicated when he made them. State v. Heather, 498 S.W.2d 300 (Mo.App.1973). In State v. Hyster, 504 S.W.2d 90 (Mo. 1974), the defendant's statements were held to be voluntarily made even though he had been drinking heavily and was shown to be moderately mentally retarded. Finally, our research discloses two cases where the defendants' statements were held to be voluntarily made despite the psychological stress and physical pain of gunshot wounds. State v. Selman, 433 S.W.2d 572 (Mo. 1968); United States ex rel. Cronan v. Mancusi, 444 F.2d 51 (2nd Cir. 1971).

Under the circumstances, we find that the trial court did not err in denying the motion to suppress the statement.

Finally, appellant contends that there was error in giving the flight instruction because there was no evidentiary support for the giving of such instruction. He argues that the defendant was shot and the reason for removing himself from the scene was not motivated for the purpose of avoiding arrest, but for the reason of "self-preservation and not an attempt to avoid arrest and trial." This point was not set forth in the motion for new trial, and hence was not preserved for review. Rules 27.20(a) and 70.02, V.A.M.R.[5]

We have read the full transcript, the briefs, the authorities cited by the parties and find that there is no reversible error.

The judgment is affirmed.

McMILLIAN and GUNN, JJ., concur.

5. Although the point was not preserved, we believe the court did not err in giving this instruction under the circumstances of this case. The defendant was at the scene, a shoot-out occurred and the defendant, although shot, and his companion ran south on Skinker. The police quickly came to the scene. The trail of blood led to where the defendant was located. He was found by the officers in a bedroom, partially under a bed. Under such circumstances, we believe that the court did not err in giving the flight instruction.

The flight of the defendant under the circumstances here was not for the "sole" purpose of preserving himself, as defendant argues. The flight was not simply out of the line of fire, but the defendant proceeded for two blocks to his bedroom. Under the facts, the jury could determine that it was also for the purpose of avoiding arrest.