**STATE of Missouri, Respondent,**

v.

**Tommy L. HUNT, Appellant.**

**No. KCD 29519.**

Missouri Court of Appeals, Kansas City District.

July 31, 1978.

Motion for Rehearing and/or Transfer Denied Aug. 28, 1978.

Application to Transfer Denied Oct. 10, 1978.

Lee M. Nation, Asst. Public Defender, Kevin Locke, Kansas City, for appellant.

John D. Ashcroft, Atty. Gen., John M. Morris, III, Asst. Atty. Gen., Jefferson City, for respondent.

Before WELBORN, Special Judge, Presiding, PRITCHARD, J., and HIGGINS, Special Judge.

ANDREW J. HIGGINS, Special Judge.

Appeal from judgments on convictions by a jury of kidnapping and sodomy. The questions are: Whether the Jackson County jury selection process denied defendant his Sixth Amendment rights; whether there was sufficient evidence of the corpus delicti of sodomy; whether a mistrial should have been declared for juror misconduct; and whether a hearsay statement of the victim qualified as an excited utterance. Affirmed.

Appellant charges the court erred (I) in overruling his motion to quash the jury panel insofar as Jackson County's procedure for selection of jury panels allows women an automatic exemption which denies the accused his right to a jury composed of a representative cross-section of society, thus denying him his Sixth Amendment rights.

For purposes of this opinion, it may be assumed that appellant's contention has been preserved. It is not presently an open question in Missouri. See *State v. Duren,* 556 S.W.2d 11, 13–18 (Mo. banc 1977), and *State v. Lee,* 556 S.W.2d 25 (Mo. banc 1977), where identical contentions were denied.[1]

Appellant charges the court erred (II) in failing to enter judgment of acquittal insofar as there was insufficient evidence of the corpus delicti of the crime of sodomy. The argument is that there is insufficient corroboration of defendant's confession to warrant a conviction; that is, "[p]roof of a confession of a crime not made in open court, without independent proof of the corpus delicti, will not sustain a conviction." *State v. Craig,* 328 Mo. 938, 43 S.W.2d 413, 414 (1931). See also *State v. Capotelli,* 316 Mo. 256, 292 S.W. 42 (1926); *State v. Patterson,* 347 Mo. 802, 149 S.W.2d 332 (1941); *State v. Bowman,* 294 Mo. 245, 243 S.W. 110 (1922); *State v. Humphrey,* 358 Mo. 904, 217 S.W.2d 551 (1949); *State v. Summers,* 362 S.W.2d 537 (Mo.1962); *City of St. Louis v. Watters,* 289 S.W.2d 444 (Mo.App.1956).

1. Petition for writ of certiorari was granted by the Supreme Court of the United States in

*Duren v. Missouri,* 435 U.S. 1006, 98 S.Ct. 1875, 56 L.Ed.2d 387, 1978.

The rule in Missouri is that "full proof of the corpus delicti, independently of the confession, is not required. If there is evidence of corroborating circumstances which tend to prove the corpus delicti and correspond with circumstances related in the confession, both the circumstances and the confession may be considered in determining whether the corpus delicti is sufficiently proved in a given case." *State v. Skibiski,* 245 Mo. 459, 150 S.W. 1038, 1039 (1912); *State v. Colton,* 529 S.W.2d 919 (Mo.App.1975).

Appellant concedes a case of kidnapping was made; and the question thus becomes whether the corroborating evidence is sufficient to satisfy the foregoing rule in order to bring defendant's confession of sodomy into the corpus delicti determination.

The indictment charged that on September 12, 1976, Tommy L. Hunt did "forcibly seize and kidnap one Phillip J. Weyant * * * "; and did "commit the abominable and detestable crime against nature by then and there inserting the penis of him * * into the mouth of one Phillip J. Weyant * * *."

Phillip J. Weyant, age 4, was found incompetent to testify due to his tender years. His brother, Joe Michael Weyant, age 9, was found competent to testify. According to Joe Michael, he and Phillip were playing before supper on September 12, 1976, near Holy Cross School in the same block as their home at 148 North Bellaire. Joe Michael was riding a bicycle; Phillip was riding a tricycle. A man, subsequently identified as the defendant, rode up to them on a red, ten-speed bicycle. Joe Michael had seen the man about a week earlier when the man frightened him, Phillip, and several of their cousins at a Skaggs Drugstore. Defendant began throwing the boys' cycles against a wall and into the street. After awhile, perhaps half an hour, he took Phillip from his tricycle, put him on the red bicycle, and left with him. Phillip was crying and asking to be put down; Joe Michael was yelling to defendant to stop to no avail. Joe Michael pursued his brother's abductor but lost him after he turned a corner. Joe

Michael then went home and told his mother what had happened and the police were called. After they came, Joe Michael accompanied them to the station where he participated in the construction of a composite picture of defendant. He later identified defendant in a lineup.

Josephine Bonnie Weyant saw her son, Joe Michael, when he came home upset at about 5:30 p. m., September 12, 1976. She had previously last seen him and her son, Phillip, at about 5:00 p. m., when they were playing on their cycles. After talking to Joe Michael, she and her husband called the police. They arrived about half an hour before Phillip got home. She saw Phillip around 7:30 to 8:00 p. m. He was messy and dirty; "he was quite stunned and he just didn't look good at all. He was very white at the face." She tried to talk with him, as did the police. He would not talk to her and was reluctant to talk to the police. "He talked to his dad. He would try to put me out because he was ashamed." She previously had seen the defendant a week before when "he was harassing the children in the [Skaggs] drug store."

James D. Harbison of 2006 East 48th Terrace, was at the corner of 11th and Van Brunt in the evening, September 12, 1976, visiting property he owned at 1016 Van Brunt. He saw a young person, fifteen or sixteen years of age, five-six or seven, sitting on a red bicycle at the steps of the house next door, 4630 East 11th Street. "I went down into the street and across the street so that I might get a better look at the young man * * * and he maneuvered so that I couldn't see him, behind a tree, and kept facing away from me. * * I approached him and he rode around the corner * * *. I ran to the corner to try to get a better look and at that time, I saw a small boy on the porch of 4630 East 11th Street. * * * it was between 7:30 and 8:00 o'clock in the evening * * * he had the screen door open * * * knocking on the door. * * * The boy was crying, and he told me he wanted his mother. * * he looked kind of bedraggled and he was dirty, and he was frightened * * *. He

was sobbing. He had been crying for some time, * * *. I thought he had been injured and he didn't seem to have been injured * * *. He was a little frightened of me, too. * * * I asked him 'What is your trouble, son, what do you want?' * * * He said he wanted the police. And I asked him what his trouble was. And then he said * * * that fellow had hurt him and left him there." He and his wife calmed the child, after which the child was able to direct them to his home where they delivered him.

Officer Robert Fordemwalt of the Kansas City Police Department was dispatched to 148 North Bellaire at 7:08 p. m., September 12, 1976, to investigate an alleged kidnapping and sodomy. He arrived there at 7:10 p. m., where he talked to Leroy J. Weyant and his sons, Phillip and Joe Michael. Phillip "was in a dirty condition, like he had been rolling in the dirt * * * he had a bruise above his left eye." He obtained a description of the suspect and broadcast it over his radio, viz., "white male, fifteen to seventeen years old; height, five foot seven inches to five foot nine inches. Medium build, sandy colored hair * * * riding a red ten-speed bicycle."

Officer James Barbee of the Kansas City Police Department went to the Weyant home about 6:00 p. m., September 12, 1976, while looking for a young white male, approximately five years old, reported missing. He talked later with the Weyant parents around 6:00 to 6:30 p. m., when Officer Fordemwalt was interviewing Phillip, after which he prepared the composite drawing of a molestation suspect. On September 13, 1976, he was riding patrol with Officer James Browning. They discussed the case and considered the composite drawing. Officer Browning recognized the suspect as Tommy Hunt, and the two officers proceeded to the area of 12th and Jackson where they found him. Officer Barbee advised defendant of his rights, after which he admitted he picked the boy up and took him down by Skaggs at Independence Avenue where he made the boy perform fellatio on him. Defendant was taken to central police headquarters where he was questioned by Detective William Frazier.

Detective William Frazier also advised defendant of his rights after which he made the confession in question in his own words as follows: "I left my house about 5:30 p. m. and rode over to my girl friend's house on my bicycle. I stayed there about twenty to thirty minutes. I went up to Cliff Drive and then I came back down to St. John and Bellaire where I saw these three boys playing. One of the boys asked me to take him for a ride. This boy had shorts and some kind of shirt on. I have heard his name but I can't remember it now. I rode my bicycle with the boy on it down to Skaggs Drug Store at Independence Avenue and White Street. By Skaggs Store, there is a bunch of trails running up to the railroad tracks and I took the boy up there. When we got up there, I told him to suck my dick. I unzipped my pants and took my dick out and I squatted down a little bit so he could suck me off. The boy told me that he didn't want to do this and stated he wanted to go home. I told him I wouldn't take him home until he sucked me off. After I told him this, I put my dick in his mouth and he sucked it for about fifteen minutes. When I got through, he spit something out of his mouth, I don't know what you call it. I then took the boy up around 9th and Van Brunt Extension where I dropped him off and then I went home."

Following completion of the statement, defendant was asked, "Is there anything else you would want to say in connection with this statement?" He answered: "I would like to say that I wasn't truthful when you asked me if I ever struck the boy. I pushed him down when we first went on the hill behind Skaggs. After I pushed him down, that's when I told him I wasn't going to take him home—back home, if he didn't do what I told him to do."

Detective Frazier also asked defendant why he did these things to this boy. "He said that some man did that to him when he was a little boy."

Tommy L. Hunt, 19 at trial, denied any association with the Weyant boys on Sep-

tember 12, 1976. He admitted the incident at Skaggs a week before when four or five boys, including the Weyants, "got scared or something" and "took off." He stated that most of his confession was made up and that he made it and signed it only for the purpose of going home.

Defendant also presented his aunt, uncle, cousin, mother and father in support of his alibi defense.

The foregoing demonstrates satisfaction of the rule of *State v. Skibiski,* supra. As said in *The State v. Patterson,* 73 Mo. 695 (1881), a homicide case from which the rule is taken: "It is unnecessary that the *corpus delicti* be established by direct and positive testimony; * * * It is sufficient, in addition to the extra-judicial confessions, which in this instance in express terms admit all the indictment charges, that there be such extrinsic corroborative circumstances, as will, taken in connection with the confession, produce conviction of the defendant's guilt in the minds of the jury. It has often been ruled * * * that confessions uncorroborated by circumstances are insufficient. * * * This is equivalent to asserting their sufficiency when meeting with the necessary corroboration. * * * such suppletory evidence need not be conclusive in its character." 73 Mo. l. c. 712–713.

The foregoing is consistent with decisions on the independent corroboration rule in federal courts; for example, *Moll v. United States,* 413 F.2d 1233, 1239 (5th Cir. 1969): "Evidence introduced to corroborate a confession * * * must be substantial enough to establish the trustworthiness of the confession"; *Mapys v. United States,* 409 F.2d 964, 967 (10th Cir. 1969): " * * * it is not necessary that the corroborating evidence be sufficient, independent of the statement, to prove the crime charged. The rule is satisfied if there is substantial independent evidence which will tend to establish the trustworthiness of the confession or incriminating statement." McCormick, Evidence 2d ed. § 158, p. 349, in discussing the phraseology of the federal cases and the traditional rule, states: "It is

doubtful whether this makes much practical difference."

█ Appellant charges the court erred (III) in failing to declare a mistrial when it appeared that one of the jurors, following an evening recess, spoke with two State's witnesses in violation of the court's adjournment instruction against such communications.

The incident is described on the record by defense counsel:

"MR. BLOEMKER: * * * Upon leaving the courtroom, following the recessing of the proceedings for the evening, and on my way to the elevator, I observed the State's first witness, Officer Fordemwalt, conversing with Juror William E. Werner. Now, I wasn't able to overhear their conversation and I don't know the content of it, but the conversation was taking place by the stairway, in the hallway close to the elevators, and their conversation was taking place I would estimate five or six feet distant from a conversation that was taking place among another group of people. Included in the second group was Officer Barbee; the victim was also in the area; the victim's brother, Joe Mike, was in the area, and the mother of the victim was there; I don't recall whether the father was in the group or not. I am unable to say exactly what the topic of their conversation was, but the words that they were speaking were audible from a considerable distance, and I am sure would have been audible the five or six feet away from Mr. Werner and Officer Fordemwalt were standing.

"THE COURT: Okay. I sent the bailiff out as soon as I was aware of it. You caught—just relate what you did and what you understood. * * * MR. THEDINGER: For the record, I'm not sure of the name of the juror or the name of the officer. But I did approach them. I recognized the man as a juror and I did approach the two and I did not overhear their conversation, and my first words to them were to the effect 'Are you talking about this case?' The response of the juror was 'No, we are not', and he said something to the effect that he played baseball, or that the officer

with whom he was talking either played baseball with him or for him. And I told them that it looked bad, and that I—and I asked them not to have any more conversations until the case was over. And after that, the juror said 'Sure', and he immediately left and headed toward the elevator, and I came back in the courtroom. THE COURT: Okay. Let's pursue it further in the morning when the juror gets in * * we'll interrogate him further. And if you want, I'll do that, rather than you in some way alienate the jurors."

At the outset of proceedings the next day, juror Werner was questioned by the court:

"THE COURT: Mr. Werner, last night, were you the one that was talking to the police officer that was the first witness? JUROR WERNER: That's right, yes. THE COURT: Would you relate to us what that conversation was about? JUROR WERNER: This young man, Bob Fordemwalt, I have known since he was maybe four or five—the whole family, played baseball for me. I used to manage ball teams. And he played baseball for me back in Midget A, and Midget B and Midget C, and this is the first time I have seen the young man since he was ten years old, and I have seen his dad on and off since then, but that was it. And I was flabbergasted. It had nothing to do with the case. I just wanted to let him know who I was and he didn't even recognize me after all.

"THE COURT: When you were talking to him, were there any other conversations going on out in the hallway that were audible that you overheard? JUROR WERNER: No, the only thing that did happen, the young man, I was standing there talking to the officer and the young man—well, I don't remember his name— THE COURT: This man here? JUROR WERNER: No, the boy, the boy. THE COURT: Oh, all right. JUROR WERNER: Walked up to me and said—and he was with some other quite large gentleman, walked up to me and the officer and says 'How did I do, did I do good?', to me and the officer, but whichever one, I don't know, and, of course,

we poo-pooed him on, he had done fine, and then this larger man grabs him, and I just told Bob 'Glad to see you; tell your mother and dad hello from me.' It had no bearing in relation to anything to the case whatsoever.

"THE COURT: Anything that either of you want to ask? MR. STIGALL: I have no questions. MR. BLOEMKER: No."

■ Private communications, possibly prejudicial, including innocent visiting, between jurors and third persons or witnesses are forbidden and will invalidate a verdict unless their harmlessness be made to appear. *State v. Jones,* 363 Mo. 998, 255 S.W.2d 801 (1953); *State v. Edmondson,* 461 S.W.2d 713 (Mo.1971); *State v. Raspberry,* 452 S.W.2d 169 (Mo.1970); *State v. Miles,* 364 S.W.2d 532 (Mo.1963). The question in such situations is whether the incident in a given case results in prejudice to defendant such that the court is guilty of an abuse of discretion in refusing to grant a mistrial. *State v. Foster,* 490 S.W.2d 659, 661 (Mo. App.1973); *State v. Edmondson,* supra, 461 S.W.2d l. c. 724.

Appellant concedes, properly so, that "the Werner-Fordemwalt conversation is relatively harmless," and focuses attention on the Weyant-Werner conversation. The single question inquiry of juror Werner by young Weyant appears innocent and uncalculating, and Mr. Werner's reply appears in the same spirit. Similar circumstances did not demonstrate an abuse of discretion in *State v. Eaton,* 504 S.W.2d 12, 21–22 (Mo. 1973).

■ Appellant charges the court erred (IV) in permitting State's witness Harbison to state that the victim said of the man who put him off the red bicycle and rode away, "that fellow had hurt him and left him there."

Appellant recognizes that in Missouri certain hearsay statements are nonetheless admissible as "excited utterances." *State v. Gilreath,* 267 S.W. 880 (Mo.1924). He argues, however, that the time 5:30 to 8:00 p. m., during which the sodomy was committed, makes it impossible to say how soon

after the incident the victim may have spoken to Mr. Harbison, and that the statement came too late to qualify as an excited utterance.

The circumstances of Mr. Harbison's encounter with both the defendant and his victim have been stated in detail, and they, together with those in defendant's confession, demonstrate the shocked condition of the child and that the utterance in question followed immediately his release by defendant. Such circumstances are similar to those showing admissibility of the excited utterance of the sodomy victim in *State v. Smith*, 540 S.W.2d 189, 190–191 (Mo.App. 1976). See also McCormick, supra, l. c. § 297, p. 709: "In rape cases, and increasingly in cases of sex offenses generally, evidence is admissible that the victim made complaint. The only time requirement is that the complaint have been made without a delay which is unexplained or is inconsistent with the occurrence of the offense, in general a much less demanding time aspect than with the typical excited utterance situation."

Judgment affirmed.

All concur.